**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Janyce CARTER, Defendant-Appellant.**

**No. 82–2174.**

United States Court of Appeals,
Seventh Circuit.

Argued April 12, 1983.

Decided Nov. 7, 1983.

John M. Cutrone, Chicago, Ill., for defendant-appellant.

Daniel Purdom, Asst. U.S. Atty., Dan K. Webb, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before POSNER and COFFEY, Circuit Judges, and GRANT, Senior District Judge.*

COFFEY, Circuit Judge.

Defendant-appellant, Janyce Carter, appeals her conviction and sentence in the United States District Court, Northern District of Illinois, for participating in an unauthorized loan of postage stamps and an attempt to conceal such loan, in violation of 18 U.S.C. § 371, 18 U.S.C. § 1711, and 18 U.S.C. §§ 2073, 2. We affirm.

## I.

As of April 15, 1982, Janyce Carter had worked for the United States Postal Service for sixteen years. In August of 1980 Carter was assigned to the Irving Park Postal Station, Chicago, Illinois, as a distribution window clerk. Her responsibilities included the selling of stamps and the performing of other postal transactions with the public.

Prior to beginning her duties as a distribution window clerk, Carter attended a two-day training seminar to review the procedure used in conducting window transactions and to learn her responsibilities in accounting for postal funds. As part of the program Carter received and signed a Public Funds Statement.[1] Carter also received a supply of stamps and cash known as her stamp credit. In acknowledgement of this stamp credit, Carter signed a fixed credit receipt which provided, in part, "withdrawal of fiscal funds for personal use, whether temporary or permanent, may subject employees ... to removal from office, ... and criminal prosecution for violation of Title 18, Section 641 or 1711 United States Code." Carter also received a Daily Financial Report form which the Postal Service requires each distribution window clerk to use in recording the "stamp sales, ... the various transactions conducted by the window clerk and the cash they have received incident to those transactions."

Though Daily Financial Reports are completed and filed on a daily basis, audits occur periodically. The Postal Service, through its Postal Supervisors, audits each distribution window clerk three or four times a year to determine if their stamp credit is within certain tolerance levels.[2] If a distribution window clerk's stamp credit exceeds the tolerance level allowed, the clerk must repay the excess amount to the Postal Service and await a decision by Postal authorities as to whether or not a suspension is in order. Internal audits are also performed by the Chicago Post Office

---

* The Honorable Robert A. Grant, Senior District Judge of the Northern District of Indiana, is sitting by designation.

1. Inspector Hull, an investigator for the United States Postal Service, testified that "the purpose [of the Public Funds Statement] is to insure that the employees are aware of their responsibilities relative to the handling of public funds and to insure that they handle them properly, that they can't use, [sic] convert them to their own use in any manner."

2. The United States Postal Service tolerance levels range from $10.00 to $50.00, depending on the size of the stamp credit.

through Postal System Examiners on a surprise basis or upon the request of a supervisor. Postal authorities attempt to conduct audits without the knowledge of the various window clerks, but, because the audits are made on a somewhat regular basis and because of the employees' rumor mill, clerks usually know of the audits in advance.

The evidence at trial revealed that on the morning of April 15, 1981, Carter learned that she was to be audited by Postal authorities. Carter immediately phoned Anna Shelby, a distribution window clerk at the Wicker Park Postal Station, Chicago, Illinois, and asked for a stamp loan in order that she (Carter) might cover her stamp credit deficiency.[3] During the lunch hour on April 15, 1981, Shelby loaned Carter $4,500.00 worth of stamps. That evening, a Postal System Examiner audited Carter's Daily Financial Report and despite the $4,500.00 "stamp loan" earlier in the day, the Examiner still found that Carter had a deficit of $1,137.48. Carter agreed to repay this amount to the Postal Service. Later that evening Shelby phoned Carter to determine when the stamps would be returned. Carter informed Shelby that because Carter expected more audits in the next few weeks, she could not return the stamps immediately. During the next three months Shelby frequently phoned Carter asking for return of the stamps and was repeatedly told that Carter was unable to return them at that time. Carter on one occasion stated that she was attempting to secure a loan in order to repay the amount in money rather than stamps. During the period in question Shelby was falsifying her Daily Financial Report.

In late July of 1981, Shelby learned that Postal Systems Examiners were going to audit the Wicker Park Postal Station. When she informed Carter of this audit, Carter again refused to return Shelby's stamps. Shelby, in turn, borrowed $4,500.00 worth of stamps from Shirley McNeary and "came up clear" on the audit. Shortly thereafter, Shelby returned the borrowed stamps to McNeary. A week later the Postal Supervisors conducted their own audit and determined that Shelby's Daily Financial Report showed a $4,500.00 deficit. Shelby was placed on an immediate emergency suspension (twenty-nine days). On August 24, 1981, Shelby informed Postal Inspector Hull, an investigator for the United States Postal Service, that the reason for her $4,500.00 deficit was the previous stamp loan to Carter. Shelby, at that time, agreed to cooperate with the Postal Service in an effort to apprehend Carter. Pursuant to the agreement, Postal authorities taped phone conversations between Shelby and Carter on September 1, 2, and 6 of 1981. On September 6, 1981, the following conversation took place:

> Shelby—"I'm not paying it, okay, okay, then okay. I won't pay it . . . . Listen okay, well I won't pay any attention to them. What I'm saying is tomorrow is even a holiday and they're even talking about bringing me downtown, okay? What I'm saying to you is I loaned them to you in good faith, right? Huh?"
>
> Carter—"Yes, Ann."
> Shelby—"Huh?"
> Carter—"Yes, yes Ann."

Following this conversation the Government called for a Federal Grand Jury investigation and on April 14, 1982, the Grand Jury issued a three count indictment against Carter for the following: (1) conspiring to participate in the unauthorized loaning of postage stamps in violation of 18 U.S.C. § 371; (2) advising and participating in the unauthorized loaning of postage stamps in violation of 18 U.S.C. § 1711; and (3) willfully concealing the unauthorized loan in violation of 18 U.S.C. §§ 2073, 2. At trial, the jury returned a verdict of guilty on all counts. The trial judge sen-

3. Shelby testified that Carter had contacted Shelby in early April, claiming that she (Carter) was roughly $5,000.00 short in stamps. The reason for Carter contacting Shelby was that in the fall of 1980 Carter had loaned $900.00 worth of stamps to Shelby, so that she (Shelby) could clear an audit. Shelby testified that she did in fact return the $900.00 worth of stamps to Carter.

tenced Carter to two concurrent seven-year terms in the custody of the Attorney General on counts II and III of the indictment, to be followed by a five year probationary period as to count I of the indictment.

On appeal, Carter contends:

(A) That the agreement required to violate 18 U.S.C. § 1711 precludes a finding of conspiracy to violate 18 U.S.C. § 1711 as alleged in count I of the indictment.

(B) That the Government's evidence to convict under 18 U.S.C. § 2073 failed to show appellant's knowledge and, therefore, could not support the jury's verdict.

(C) That the district court abused its discretion by allowing the Government to elicit testimony concerning a "NSF" check for $1,800.50.

(D) That the prosecutor's closing argument, which speculated as to why appellant had changed her previous testimony, constituted reversible error.

(E) That the trial judge's sentencing constituted an abuse of discretion.

We shall consider these issues individually.

## II.

### A. CONSPIRACY AND THE SUBSTANTIVE OFFENSE

Appellant claims that count I of the Government's indictment alleges that Janyce Carter conspired to participate in the unauthorized loaning of postage stamps in violation of 18 U.S.C. § 1711. Appellant reasons that the substantive offense, an unauthorized loaning of postage stamps, requires an agreement between two parties, namely the lender and the borrower, and thus precludes a charge of conspiracy based upon the same agreement. Relying upon

*Pinkerton v. United States,* 328 U.S. 640, 643, 66 S.Ct. 1180, 1181, 90 L.Ed. 1489 (1946), appellant contends that the agreement which is the subject of the substantive offense cannot be used as the basis for a finding of conspiracy where there is no ingredient in the conspiracy not present in the completed crime.

We do not reach this issue for two reasons. First, appellant's failure to present this legal issue to the district court results in a waiver of that issue on appeal. As this court has stated on numerous occasions, "it is a well-established general proposition that a litigant cannot present to this court as a ground for reversal an issue which was not presented to the trial court and which it, therefore, had no opportunity to decide." *Holleman v. Duckworth,* 700 F.2d 391, 394–95 (7th Cir.1983). *See also Textile Banking Co., Inc. v. Rentschler,* 657 F.2d 844, 853 (7th Cir.1981), *United States ex rel. Moore v. Brierton,* 560 F.2d 288, 291 (7th Cir.1977), *cert. denied,* 434 U.S. 1088, 98 S.Ct. 1285, 55 L.Ed.2d 794 (1978). Because the 753 page trial record and accompanying pleadings are void of any argument even resembling appellant's contention that the substantive offense and the conspiracy merge, we do not reach this issue.

Second, even if the issue were properly before us a complete reading of count I of the indictment reveals that the conspiracy "to knowingly participate in the unauthorized loaning of ... postage stamps" not only included participation in the unauthorized loaning of postage stamps, but also included concealing the unauthorized loan and thereby defrauding the United States Postal Service.[4]

**4.** Count I of the indictment provides in pertinent part:

"OVERT ACTS

1. *The Grand Jury realleges and incorporates by reference the allegations contained in Counts Two and Three of this indictment, each count designated herein as a separate and distinct overt act.*

2. In or about early April 1981, the defendant Janyce Carter had a telephone conversation with Anna Shelby.

3. In or about mid-April 1981, the defendant Janyce Carter met with Anna Shelby at or near the Wicker Park Postal Station in Chicago.

All in violation of Title 18, United States Code, Section 371" (emphasis added).

Count III of the indictment provides in pertinent part:

"In or about May 1, 1981, at Chicago, in the Northern District of Illinois, Eastern Division, JANYCE CARTER, defendant herein, did wilfully and with intent to deceive, mislead and defraud the United States Postal Service, aid, abet, counsel and cause Anna Shelby, being then and there an

Count I of the indictment, when read in its entirety, thus alleges that Carter agreed to conceal the unauthorized loan by causing Shelby to falsely enter $8,164.02 as the "Closing Balance" on her May 1, 1981 Daily Financial Report. Appellant makes no argument that a conspiracy to conceal a loan cannot exist. In fact, such a conspiracy satisfies the test set forth by the United States Supreme Court for a violation of 18 U.S.C. § 371. *Hammerschmidt v. United States,* 265 U.S. 182, 188, 44 S.Ct. 511, 512, 68 L.Ed. 968 (1924). That being so, we hold that count I of the indictment does allege facts sufficient to fulfill the requirements of a conspiracy and we need not reach appellant's contention that a conspiracy to make an unauthorized loan merges into the substantive offense of making the unauthorized loan.

### B. KNOWLEDGE REQUIREMENT FOR 18 U.S.C. § 2073 [5]

Appellant next contends that the evidence presented at trial was insufficient to prove that she "willfully and with intent to deceive" caused Anna Shelby to make a false entry in Shelby's Daily Financial Report for May 1, 1981, in the amount of $8,164.02. Appellant claims that to prove this allegation the Government had to show that Janyce Carter knew that on May 1, 1981, Anna Shelby covered her stamp credit shortage by entering a false "Closing Balance" on her Daily Financial Report. Appellant further claims that the Government's failure to prove such knowledge renders the jury's conviction on this count improper.

 We conclude, based upon a review of the record, that the evidence does support a conviction for a violation of 18 U.S.C. §§ 2073, 2. It is a well-established principle of Federal law that when the sufficiency of evidence in a criminal conviction is questioned, the reviewing tribunal examines the record in the light most favorable to the government. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). It is not our prerogative to retry the case, weigh the evidence, or assess the credibility of witnesses. *United States v. Miles,* 401 F.2d 65, 67 (7th Cir. 1968). The verdict will not be disturbed if substantial evidence and reasonable inferences therefrom support the action of the jury. *United States v. Grabiec,* 563 F.2d 313, 316 (7th Cir.1977); *United States v. Isaacs,* 493 F.2d 1124, 1146 (7th Cir.) *cert. denied sub nom. Kerner v. United States,* 417 U.S. 976, 94 S.Ct. 3183, 41 L.Ed.2d 1146, *reh'g denied,* 418 U.S. 955, 94 S.Ct. 3234, 41 L.Ed.2d 1178 (1974).

Count III of the indictment charges that Carter did "aid, abet and cause Anna Shelby ... to make a false entry in her Daily Financial Report." Carter's knowledge of this false entry can be gleaned from the

employee of the United States Postal Service, namely, a full-time distribution clerk/window clerk assigned to the Wicker Park Postal Station, Chicago, Illinois, who was charged with the duty of filling out and filing Daily Financial Reports with the Postal Service reflecting the transactions at her assigned distribution window, to make a false entry on the Daily Financial Report for her assigned distribution window for May 1, 1981 by causing her to enter the amount of $8,164.02 in that section of said Daily Financial Report labeled 'Closing Balance', whereas, in truth and fact as Janyce Carter then well knew Anna Shelby's closing balance was overstated by approximately $4,500.00;

In violation of Title 18, United States Code, Sections 2073 and 2."

**5.** 18 U.S.C. § 2073 provides in pertinent part:
"Whoever, being an officer, clerk, agent, or other employee of the United States or any of its agencies, charged with the duty of keeping accounts or records of any kind, with intent to deceive, mislead, injure, or defraud, makes in any such account or record any false or fictitious entry or record of any matter relating to or connected with his duties;

...

Shall be fined not more than $5,000 or imprisoned not more than ten years, or both."

18 U.S.C. § 2 provides:
"(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal."

trial record. Carter was a distribution window clerk and knew that all stamps and sales had to be accounted for in Anna Shelby's Daily Financial Report. She also knew that the unauthorized loaning of stamps between employees was illegal and carried the threat of criminal prosecution. To prevent Postal authorities from discovering this unauthorized "stamp loan" and possibly pressing criminal charges, Shelby either had to alter her Daily Financial Report or replenish the amount of the deficit in stamps, cash, or a combination thereof from another source. In contrast to appellant's claim of insufficiency of the evidence, Shelby did not choose to replenish the amount of the deficit, as evidenced by her statement, "Well, Janyce, you know, I'm lying about these forms ever[y] day that I fill them out." Carter knew of Shelby's actions as evidenced by her response, "Everything is going to be all right. We are going to get it straight."

Based upon this testimony the jury could have reasonably inferred that defendant Carter knew that Shelby falsified her Daily Financial Report on May 1, 1981. Thus, the verdict will not be disturbed.

■ We also note that though defense counsel made a motion for judgment of acquittal at the conclusion of the Government's case-in-chief, he failed to renew that motion at the close of trial, in motions after verdict, or within seven days of the jury's verdict as provided for in Fed.R.Crim.Pro. 29(c). Thus it was not incumbent upon this Court to review the sufficiency of the evidence presented at trial. *United States v. Berardi*, 675 F.2d 894, 902 n. 16 (7th Cir. 1982); *United States v. Moorman*, 358 F.2d 31, 33–34 (7th Cir.), *cert. denied*, 385 U.S. 866, 87 S.Ct. 127, 17 L.Ed.2d 93 (1966); *United States v. Childress*, 347 F.2d 448, 451 (7th Cir.1965), *cert. denied*, 384 U.S. 1012, 86 S.Ct. 1936, 16 L.Ed.2d 1030 (1966). ·

### C. ABUSE OF DISCRETION

Appellant next contends that testimony about a $1,800.50 "NSF" check insinuated that Carter fraudulently drafted and forged the "NSF" check. Appellant claims that the trial judge's admission of Inspector Hull's testimony and the prosecutor's questions of Carter on cross-examination prejudiced the jury and deprived her of a fair trial.

On cross-examination of Inspector Hull, an investigator for the United States Postal Service, defense counsel asked if Carter was ever required to pay back to the United States Postal Service $1,800.50 for a "NSF" check. Inspector Hull answered in the affirmative. On redirect examination, the prosecutor questioned Inspector Hull concerning the circumstances surrounding the "NSF" check. Inspector Hull testified that on January 23, 1981, Carter accepted a check from Mary E. Lee and that "very seldom do we get a personal check for the purchase of stamp stock of that size." Due to the abnormal size of the check, Inspector Hull conducted an investigation which revealed that Carter knew Mary E. Lee, the alleged check maker.

On direct examination of Carter, her defense counsel again made mention of the "NSF" check and questioned Carter about her repayment of the $1,800.50 to the United States Postal Service. On cross-examination, the prosecutor questioned Carter concerning her relationship with Mary E. Lee, the alleged check maker. Carter testified that she knew a "Mary Cook" but that she did not know a Mary E. Lee. The prosecutor then asked if "Mary Cook is actually Mary Lee?" Carter replied, "That is what Mr. Hull said." Finally, the prosecutor, implying that Mary E. Lee and Mary Cook were the same person and that Carter knew of Mary E. Lee's checkbook, asked, "You don't know if she [Mary Cook] left a checkbook . . . in the name of Mary Lee?" To this Carter replied "No, I wouldn't."

■ Based upon this testimony, appellant claims that the Government insinuated that Carter fraudulently cashed the check, thereby prejudicing the jury and denying appellant a fair trial. Our review of the admissibility of this testimony is guided by the well-established principle that a trial judge has broad discretion in assessing the

relevancy of the testimony proffered. We will reverse a district court's ruling on the admissibility of evidence only upon a clear showing of an abuse of discretion on the part of the trial judge. *United States v. West,* 670 F.2d 675, 682 (7th Cir.), *cert. denied sub nom. King v. United States,* 457 U.S. 1124, 102 S.Ct. 2944, 73 L.Ed.2d 1340 (1982); *United States v. Lampson,* 627 F.2d 62, 66 (7th Cir.1980).

Appellant initially claims that the Government had no right to elicit testimony concerning the "NSF" check. Appellant admits, however, that her defense counsel initiated inquiry into the subject matter of the check while cross-examining a Government witness. In a similar situation, this court stated, "When a party opens up a subject, even though it may not be strictly relevant to the case, he cannot complain on appeal if the opposing party introduces evidence on the same subject." *United States v. Bolin,* 514 F.2d 554, 558 (7th Cir.1975).

By initiating the inquiry into the $1,800.50 "NSF" check, on cross-examination of a Government witness and on direct examination of Carter, defense counsel "opened the door" for the Government to elicit and develop testimony which fully advised the jury of all the facts surrounding the making and cashing of the "NSF" check. *United States v. Cavale,* 688 F.2d 1098, 1112 (7th Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 380, 74 L.Ed.2d 513 (1982); *United States v. Lynch,* 699 F.2d 839, 844 (7th Cir.1982). A party cannot be permitted on one hand to introduce evidence which appears favorable and then complain, after the circumstances are fully developed, because that evidence becomes detrimental to his cause.[6] Clearly the district court did not abuse its discretion in allowing this testimony.

Appellant next claims that the "insinuating" evidence elicited by the Govern-

ment on redirect examination of Inspector Hull constituted hearsay, and therefore, was inadmissible. On redirect examination Inspector Hull testified that an investigation of the "NSF" check revealed:

"... that the Mary Lee on the check lived in Oak Park, the same city in which Janyce Carter lived.

We investigated and found out, were able to determine that in fact Mary E. Lee knew Janyce Carter. This was corroborated by another witness by the name of Tina Chandler.

Tina Chandler, Mary Lee and Janyce Carter were all friends...."

Appellant takes the position that Inspector Hull had no personal knowledge of Carter's relationship with Mary E. Lee. The record, in fact, contains no mention of how Inspector Hull obtained this information despite an ample opportunity for the defendant, if tactically chosen, to question Inspector Hull concerning this subject matter.

Pursuant to Fed.R.Evid. 801(c), hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. *United States v. Gandara,* 586 F.2d 1156, 1158 (7th Cir.1978). In the above testimony, the only statement not made by the declarant (Inspector Hull) is Tina Chandler's corroboration of Inspector Hull's investigative determination that Mary E. Lee and Carter knew one another.

Though Tina Chandler's statement that Mary E. Lee knew Janyce Carter constitutes hearsay, its admissibility is harmless error due to the cumulative nature of the testimony. *United States v. Lee,* 413 F.2d 910, 914 (7th Cir.1969), *cert. denied,* 396 U.S. 1022, 90 S.Ct. 595, 24 L.Ed.2d 515 (1970). First, Tina Chandler's corroborative statement serves as cumulative testimony to support Inspector Hull's investigative determination that Carter knew Mary E. Lee.

6. At side bar, defense counsel made a motion *in limine* when the Government, on redirect examination of Inspector Hull, went into the circumstances surrounding the check. The court responded to defense counsel's motion:

"You asked about this check."
The Government replied,
"The Government didn't bring that up and we had no intention of bringing it up."

Second, Tina Chandler's corroborative statement could support Carter's own testimony that she knew a "Mary Cook." When questioned as to whether Mary Cook and Mary E. Lee were the same person, Carter responded, "That is what Mr. [Inspector] Hull said." Inspector Hull, however, never stated that "Mary Cook" and Mary E. Lee were the same person and he never even referred to a "Mary Cook" in his testimony. Carter's inaccurate response, "That is what Mr. Hull said," reveals that Carter herself was associating Mary E. Lee with "Mary Cook." If the jury, based upon Carter's testimony, believed "Mary Cook" and Mary E. Lee to be the same person, then Tina Chandler's corroborative statement would do nothing more than support that belief. Accordingly, we hold that, in light of the entire record, Tina Chandler's statement was merely cumulative and its admission does not rise to the level of reversible error.

■■■■ Appellant finally claims that the cross-examination of Carter concerning the "NSF" check was improper in that it attempted to show that Carter fraudulently drafted and forged the "NSF" check. Defense counsel, however, as we pointed out earlier, initiated the inquiry into the "NSF" check during his direct examination of Carter. On cross-examination, the prosecutor properly reviewed the same subject matter covered on direct examination and questioned Carter concerning the "NSF" check, including her relationship with the check maker, Mary E. Lee.

The rule is that a witness may not be impeached by a contradiction on collateral matters elicited on cross-examination. *United States v. Harris,* 542 F.2d 1283, 1306 (7th Cir.1976) (citing *United States v. Lambert,* 463 F.2d 552, 557 (7th Cir.1972)). In this instance the Government accepted Carter's answers concerning the collateral matter of Carter's relationship with Mary E. Lee and proceeded with cross-examination. The Government did not attempt to impeach Carter's testimony on this issue through the use of its own witness. For this reason, we hold that the Government's cross-examination of Carter was proper.

## D. CLOSING ARGUMENT

■■■■ Appellant next contends that the prosecutor's closing argument, attacking Carter's credibility and speculating as to why she changed her previous testimony, prejudiced the jury thus constituting reversible error.

To place the prosecutor's remarks in their proper context we must briefly review the testimony at trial. On direct examination of Carter, defense counsel attempted to establish that Carter used public transportation and that on April 15, 1981, it would have been physically impossible for Carter to have boarded public transportation at the Irving Park Postal Station, travel twenty-two blocks south and thirty-three blocks east to the Wicker Park Postal Station, receive stamps from Anna Shelby, and return on public transportation to her window clerk position all within a one-hour lunch period. To this end Carter testified that during this period she did not drive to work but that she used public transportation, though she did have access to her boyfriend's automobile on Saturday. Later in her direct examination, Carter attempted to explain her earlier testimony and stated that she had registered the title to her boyfriend's automobile in her name. She testified that because her boyfriend was changing jobs at the time of purchase, it was easier for her to obtain financing. According to Carter, "He gave me the down payment and he pays the notes."

In closing argument the prosecutor commented on this testimony:

"Janyce Carter at lunchtime went over to the Wicker Park Station, picked up the stamps.

You remember Janyce Carter testified first of all it was impossible for her to get those because she was taking a bus at that time.

Well, she testified in the morning she was taking the bus. Later on she realized that the government had documents showing she just bought a new car and then she changed her story. She bought a car in her own name with financial

problems, a loan in her own name just for her boyfriend. She had no access to that car.

Think about this testimony, people, and think about who has an interest to lie."

In rebuttal, the prosecutor stated:

"... she didn't lie in the morning and say she had no car and then look at her documents and realize I could impeach her on that, and come back and change her story. She didn't lie about that either, did she?"

Defense counsel failed or decided not to object to these remarks during trial or request any curative instructions. In the absence of any objection, our review of the closing argument is limited to determining whether or not the prosecutor's remarks were so prejudicial as to amount to plain error.[7] *United States v. West,* 670 F.2d at 688; *United States v. Spain,* 536 F.2d 170, 174 (7th Cir.), *cert. denied,* 429 U.S. 833, 97 S.Ct. 96, 50 L.Ed.2d 97 (1976).

To determine whether the prosecutor's comments were so egregious as to require reversal, we must ask whether the

"statements were so inflammatory and prejudicial to the defendant petitioner as to deprive him of a fair trial and thus deprive him of his liberty without due process of law as proscribed by the Fourteenth Amendment. The standard for the court to apply in making a determination of whether the petitioner was afforded a fair trial is [by] jurisprudential necessity a broad one.... [E]ach case must be decided on its unique facts."

*United States v. Zylstra,* 713 F.2d 1332 at 1339 (7th Cir.1983); *United States ex rel. Clark v. Fike,* 538 F.2d 750, 760 (7th Cir. 1976), *cert. denied,* 429 U.S. 1064, 97 S.Ct.

791, 50 L.Ed.2d 781 (1977). "It is thus necessary to examine the allegedly prejudicial remarks of the prosecutor in the context of the trial as a whole." *United States ex rel. Garcia v. Lane,* 698 F.2d 900, 902 (7th Cir.1983).

Placing the prosecutor's remarks in their proper context, the record reveals that at that point in his closing and rebuttal arguments the prosecutor was impressing upon the jury the credibility of Anna Shelby.[8] Her "story" had remained consistent throughout the trial. The prosecutor pointed out that Carter's "story" about access to a car had changed and that Shelby was a more believable witness because her testimony was also supported by documents. The thrust of the prosecutor's closing argument was that Anna Shelby was a more credible witness than the appellant. *See, e.g., United States ex rel. Garcia v. Lane,* 698 F.2d at 903.

The prosecutor may in argument suggest reasonable inferences from the evidence previously admitted. *United States v. McPartlin,* 595 F.2d 1321, 1360 (7th Cir.), *cert. denied,* 444 U.S. 833, 100 S.Ct. 65, 62 L.Ed.2d 43 (1979). Though the Government never introduced a proof of title evidencing Carter's car ownership, the prosecutor did ask Carter, "Beginning March of 1981, you had just purchased a new car in your name, hadn't you, a 1979 Thunderbird?" This question, which was answered in the affirmative, reveals that the Government knew when the automobile was purchased and that it was a 1979 Thunderbird. With these facts before them, a jury could reasonably infer that the Government knew of Carter's car ownership thus causing Carter

---

**7.** "We do not hold that the error was waived because we recognize the tactical considerations that militate against interrupting an adversary's closing argument. We are inclined to believe, however, that if the comment were sufficiently prejudicial to warrant reversal, counsel who was present at the time either would have objected forthwith or else would have requested the trial judge to give a curative instruction. There was opportunity after argument, and before the court instructed the jury, to make such a request. The absence of any

such request tends to corroborate our appraisal of the probable impact of the remark as minimal." *United States v. Trutenko,* 490 F.2d 678, 680 (7th Cir.1973).

**8.** Unlike the facts in *Berger v. United States,* 295 U.S. 78, 89, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935), the prosecutor's remarks were confined to a single instance, in closing and in rebuttal, concerning witness credibility.

to change her "story." [9] Though we may have tempered our remarks in closing argument so as to avoid even the suggestion of prejudice, the prosecutor's comments, herein, fail to rise to the level of plain error.[10]

### E. SENTENCE

▪▪▪▪ Appellant finally contends that the trial judge imposed an improper sentence. The sentence consisted of the imposition of two concurrent seven year terms under the supervision of the Attorney General for violation of 18 U.S.C. § 1711 and 18 U.S.C. §§ 2073, 2, followed by a five year probationary period for a violation of 18 U.S.C. § 371. The statutes in question provide as follows: one who violates 18 U.S.C. § 1711 is to be fined equal to the sum of the amount of the money embezzled or imprisoned not more than ten years or both; one who violates 18 U.S.C. § 2073 is to be fined not more than $5,000 or imprisoned not more than ten years or both; and one who violates 18 U.S.C. § 371 is to be fined not more than $10,000 or imprisoned five years or both.

We deal briefly with this issue, as the law is well-established that a sentence within the statutory maximum provided by Congress is only subject to review on appeal for manifest abuse of discretion. *United States v. Fleming,* 671 F.2d 1002, 1004 (7th Cir. 1982); *United States v. Madison,* 689 F.2d 1300, 1312 (7th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 754, 74 L.Ed.2d 971 (1983); *United States v. Shelton,* 669 F.2d 446, 466 (7th Cir.), *cert. denied sub nom. Bledsoe v. United States,* 456 U.S. 934, 102 S.Ct. 1989, 72 L.Ed.2d 454 (1982); *United States v. Main,* 598 F.2d 1086, 1094 (7th Cir.), *cert. denied,* 444 U.S. 943, 100 S.Ct.

301, 62 L.Ed.2d 311 (1979). In accord with *United States v. Grayson,* 438 U.S. 41, 98 S.Ct. 2610, 57 L.Ed.2d 582 (1978), the trial judge observed Carter throughout the trial, heard the testimony of witnesses, reviewed and analyzed Carter's presentence report, and listened to defense counsel's arguments. Based upon these factors the trial judge, in a detailed and well-reasoned sentencing report, imposed a sentence upon Carter. The sentence imposed is within the statutory maximum, thus there exists no abuse of discretion.

### III.

We affirm the judgment of conviction and sentence of Janyce Carter.

AFFIRMED.

---

**9.** Additionally, the instruction to the jury provided:

 "opening statements, closing arguments, and other statements of counsel should be disregarded by you to the extent that they are not supported by the evidence."

**10.** We remind Government counsel of footnote 13 in *United States v. Falk,* 605 F.2d 1005, 1013 (7th Cir.1979). "While we have concluded that the Government's closing argument does not require a reversal in this case, once again we admonish Government counsel to observe rec-

ognized standards in their closing arguments. *See, e.g.* American Bar Association Standards Relating To The Prosecution Function and particularly Section 5.8 Argument to the Jury. Failure of Government counsel to observe proper standards in their closing arguments has resulted, all too frequently, in this court's devoting substantial time to reviewing the record to determine the probable effect of the improper argument. It may well in some case result in a reversal which could have been avoided by adherence to proper standards."