**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Joan L. LYNCH, Defendant-Appellant.**

No. 81–2399.

United States Court of Appeals,
Seventh Circuit.

Argued June 2, 1982.

Decided Sept. 3, 1982.*

Opinion Jan. 28, 1983.

* This appeal was originally decided by unreported order on September 3, 1982. See Circuit Rule 35. The Court has subsequently decided to issue the decision as an opinion.

Matthias A. Lydon, Pierce, Lydon, Griffin & Montana, Chicago, Ill., for defendant-appellant.

Phillip A. Turner, Asst. U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before WOOD and ESCHBACH, Circuit Judges, and CAMPBELL,** Senior District Judge.

PER CURIAM.

The defendant, Joan Lynch, appeals her conviction on nine counts of mail fraud under 18 U.S.C. § 1341 and one count of conspiracy to commit racketeering under 18 U.S.C. § 1962(d).[1] Underlying these charges was her participation with her husband, Ronald Lynch, now deceased, Joseph Armato, James Woodlock, and Jimmie Smith in a scheme to bypass administrative procedures at the Cook County Board of Appeals ["the Board"] in order to obtain reductions in Cook County property tax assessments for clients of the R.M. Lynch Company. The defendant and her husband, before his death, owned the company, which was in the business of representing property owners appealing real estate tax assessments before the Board.

The R.M. Lynch Company functioned by bribing employees at the Board to forge the initials of Board of Appeals Commissioners indicating approval of reductions. The Commissioners were authorized by law to reduce property tax assessments, but this scheme bypassed all administrative review of the assessments. It was implemented by passing lists of R.M. Lynch Company cases to Board employees. The lists itemized the company's cases pending before the Board and distinguished between cases where reductions were sought and cases where they were not. Employees at the Board received and forwarded the lists to Deputy Commissioners, Thomas Lavin and Donald Erskine. Lavin and Erskine, in turn, forged the Commissioners' initials. Thus, property tax reductions were obtained for R.M. Lynch Company clients without any review of the initial tax assessments. The R.M. Lynch Company paid an estimated $111,000 in bribes to Board employees over five years to effectuate this scheme.

The defendant first argues that the evidence presented at trial, even taken in the light most favorable to the government, *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), does not show her knowledge of the scheme or her participation in it. Despite the defendant's contentions, substantial evidence supported the jury's conclusion.

In addition to secretarial duties at this small family-owned company, the defendant was the bookkeeper. She kept the financial records, wrote checks, and billed clients during the period before her husband's death. The government introduced evidence to show that the company may have bribed employees at the Board with funds withdrawn from eight different bank accounts. The defendant prepared the checks and recorded the withdrawals in account records as "cash" or "draw." She also typed the lists informing Board employees of the company cases where reductions were sought. The defendant argues that this evidence hardly implicates her in the bribery scheme. She contends that the activities were entirely consistent with her secretarial and bookkeeping responsibilities at the company.

Other evidence introduced at trial, however, belies this contention. One month after her husband's death, the defendant personally paid James Woodlock, a computer supervisor at the Board and a major figure in the scheme, $500 in cash. Asking for the money, Woodlock explained only that it was a debt Ron Lynch owed him. The defendant gave him the funds without further question. Woodlock testified that this payment followed a previous conversation with Joseph Armato, a company employee, which occurred in the defendant's presence and after her husband's death. Armato told Woodlock "you know, everything is going to keep going, the company, everything will be going. The deal that we

---

** The Honorable William J. Campbell, Senior District Judge for the Northern District of Illinois, is sitting by designation.

1. The defendant was sentenced to pay a fine of $1000 on each mail fraud count and a fine of $25,000 on the racketeering count plus probation for five years and restitution to Cook County of $100,000.

have will still be there." The defendant concedes that she acquiesced. In addition, the defendant personally authorized nearly $3000 in payments to Woodlock and Jimmie Smith, another participant in the scheme.

Finally, the defendant admitted to an FBI agent that she was aware that her husband bribed officials at the Board and that she continued the practice herself. The defendant dismisses the significance of both statements. The defendant contends that, because neither statement demonstrates when she first discovered the bribery scheme the government failed to implicate her in the conspiracy before her husband's death. Though the statement, considered in isolation, may not demonstrate the defendant's early participation in the conspiracy, combined with the other evidence introduced at trial, the admission gives rise to the plain inference that the defendant knew of the scheme before and after her husband died.[2]

The defendant was also convicted on one count under 18 U.S.C. § 1962(d). The jury found that, with others at the R.M. Lynch Company, the defendant engaged in a pattern of racketeering activity by committing multiple acts of bribery and mail fraud.[3]

The government alleged Board employees Jimmie Smith, James Woodlock, and Thomas Lavin received bribes from the Company.

■ The defendant argues that the government presented insufficient evidence to support this conviction. The defendant asserts that the funds paid Jimmie Smith were not bribes under Illinois law because they were not intended to influence him in his official capacity. The defendant claims that Smith, who was a hearing examiner at the Board, was paid a weekly "gratuity" to monitor the status of the R.M. Lynch Company cases. Once or twice weekly, Joseph Armato passed Smith lists of pending appeals and Smith would apprise the company of the status of those cases. The defendant contends this was not illegal. *See People v. Jordan,* 15 Ill.App.3d 672, 304 N.E.2d 713 (1973).

The jury, however, had ample evidence from which to conclude that Smith's role in the scheme was broader than the defendant depicts it and that he acted in his official capacity during that time. Smith's responsibilities, as a hearing officer, included indicating on Board files that no tax reduction should accrue when a property owner did

---

2. The defendant contends the government failed in its proof because, she argues, even if the evidence presented at trial was sufficient to show her knowledge and participation in the conspiracy after her husband's death—when she assumed a far more active role in operating the R.M. Lynch Company—the government failed to prove her knowledge and participation in the scheme before her husband died. This argument ignores the well-settled principle in conspiracy law that a conspirator is liable for all overt actions of other conspirators intended to advance the scheme. This includes actions which occur before the conspirator joins the conspiracy. *United States v. Read,* 658 F.2d 1225 (7th Cir.1981). Thus, even if the government had only shown the defendant's participation after her husband's death the prosecution would have satisfied its burden. However, as mentioned, the evidence presented at trial was · stronger. It established the defendant's knowledge and participation in the scheme both before and after her husband's death.

3. In pertinent part, 18 U.S.C. § 1962(c) and (d) provide:
   (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect,

interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.
   (d) It shall be unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section. In pertinent part, Ill.Rev.Stat. ch. 38, § 33–1 provides:
   33–1. Bribery. A person commits bribery when:
   (a) With intent to influence the performance of any act related to the employment or function of any public officer, or public employee, ... he promises or tenders to that person any property or personal advantage which he is not authorized by law to accept: or ...
   (c) With intent to cause any person to influence the performance of any act related to the employment or function of any public officer, or public employee, ... he promises or tenders to that person any property or personal advantage which he is not authorized by law to accept.

not appear personally or by counsel at the Board hearing to contest the assessment. After attending several meetings where Lavin, Erskine, Woodlock, and others discussed the means to fraudulently process appeals of assessments, Smith treated R.M. Lynch Company and other cases where taxpayers did not appear as if they had. Thus, assessments in these cases were reduced even though the taxpayers or their representatives never appeared before the Board. Erskine paid Smith for these services. In addition, Smith passed the lists of the R.M. Lynch Company cases to Erskine and other conspirators. Finally, the defendant regarded Smith as acting in his official capacity since she authorized large payments to induce him to increase his efforts on behalf of the R.M. Lynch Company at the Board. The evidence at trial clearly established that Smith's activities surpassed simply monitoring the company's cases and demonstrated that Smith ignored established policies of the Board on behalf of the R.M. Lynch Company.

Further, the defendant argues that the evidence at trial did not establish the knowledge or intent necessary to engage in bribery. She contends that all bribes paid Deputy Commissioner Lavin occurred before her husband's death, when she was unaware of the scheme, and that in giving $500 to Woodlock after his death, she genuinely believed that it was repayment for a debt. This is the same argument presented previously. Having concluded that substantial evidence supported the conclusion that the defendant knew of the scheme and participated in it, we need not consider the argument again in a related context.

■ Moreover, the defendant asserts, for the first time in the reply brief, that a fatal variance existed between the proof offered at trial and the allegations raised in the indictment. The defendant argues that although the indictment charged that a single conspiracy existed to bribe employees at

the Board from 1975 to 1979, the evidence at trial established the existence of two separate conspiracies to effectuate this goal. One conspiracy operated before her husband's death, when Lynch, Lavin, Erskine, and others participated. The second operated after Lynch's death, when Lavin and Erskine no longer participated and Woodlock became the principal figure in the scheme at the Board. The argument is meritless. The mere fact that some conspirators withdraw from a conspiracy or that the methods used to perpetrate the scheme changed slightly does not indicate that one conspiracy has ended and that another has begun or that a fatal variance exists when the indictment alleges the existence of a single conspiracy. *See United States v. Lyons,* 670 F.2d 77 (7th Cir.1982).

The defendant next argues that the district court erred by declining to instruct the jury that "neither association with conspirators or knowledge of a law violation is sufficient to make the defendant a conspirator." The defendant proposed the instruction and argues that the failure to give it allowed the jury to presume the defendant's participation in the conspiracy from her close relationship with the other conspirators. The defendant argues that an additional instruction informing the jury that "no person can intentionally avoid knowledge by closing her eyes to facts which should prompt her to investigate" almost ensured that the jury would reach that conclusion.[4]

■ Despite the defendant's contentions, the jury was not misled. The district court instructed the jury that:

In determining whether the defendant became a member of the conspiracy you may consider only the acts and statements of the defendant.

To be a member of the conspiracy, the defendant need not join at the beginning

---

4. Having twice rejected similar arguments challenging this instruction, we need not elaborate further on the instruction here. *United States v. Gabriel,* 597 F.2d 95, 100 (7th Cir. 1979); *United States v. Prewitt,* 553 F.2d 1082,

1087 (7th Cir.1977). We note only that the evidence the government presented at trial and the defendant's arguments in response, clearly justified giving the instruction.

or know all the other members or the means by which the purpose was to be accomplished. The government must prove beyond a reasonable doubt, from the defendant's own acts and statements, that she was aware of the common purpose and was a willing participant.

This instruction, following Instruction 5.11, Federal Jury Instructions of the Seventh Circuit (1980), plainly told the jury that the defendant must be a "willing" participant in the conspiracy and that her participation must be proved exclusively from her own acts and statements. Since the instruction forbade the jury from reaching that conclusion by considering factors other than the defendant's statements or actions, it duplicated the defendant's proposed instruction. The district court need not give cumulative or repetitious instructions simply because the defendant prefers the language in one instruction over the language in another. *United States v. Allegretti*, 340 F.2d 254, 259 (7th Cir.) (*en banc*), *cert. denied*, 381 U.S. 911, 85 S.Ct. 1531, 14 L.Ed.2d 433 (1965).

■ The defendant next argues that by introducing her past tax returns and other financial records and by referring to her wealth in closing argument over her objection, the government placed irrelevant and seriously prejudicial evidence before the jury. Defendant argues on appeal that the district court abused its discretion under Fed.R.Evid. 403 in allowing its admission. *See United States v. Stahl*, 616 F.2d 30 (2d Cir.1980).

In his opening statement and in subsequent cross-examination of government witnesses, the defendant's lawyer asserted that she bribed Board employees to avoid financial ruin. In his opening argument he stated:

Mrs. Lynch did not participate in any corrupt payments. She did not try to defraud anyone. She is a victim just as every other citizen of Cook County is a victim when public officials abuse their offices and use them in a heavy-handed manner to get money for themselves for things that people are entitled to.

You won't see one file in which Joan Lynch had any involvement where taxes were reduced any further than they should have been. She paid money because she was told she had to pay or face economic ruin for the company, herself and her husband's children who looked to that business for support because after her death, or excuse me, after his death, that company, and its continued receipt of money was used to go into her husband's estate.

Similar suggestions were made during cross-examination.

The financial records at issue were relevant to rebut these assertions. "When a party opens up a subject, even though it may not be strictly relevant to the case, he cannot complain on appeal if the opposing party introduces evidence on the same subject." *United States v. Bolin*, 514 F.2d 554, 558 (7th Cir.1975). Moreover, the fact that the defendant only raised the issue during opening statement and in a few questions during cross-examination, does not make the evidence irrelevant. The defendant can hardly create a suspicion in the jury's mind and then argue that, because the point was made subtly, the government may not respond. Nor does the fact that much of the defendant's wealth was contained in yet uncollected accounts receivable establish that the records were irrelevant. That fact pertains only to the weight of the evidence rather than its relevancy.

■ The defendant contests several other evidentiary rulings. She argues that evidence introduced showing that the company withdrew large amounts of cash from accounts at eight banks and charged those withdrawals to "cash" or "draw" was irrelevant. Despite the defendant's explanation that it was standard bookkeeping procedure in a sole proprietorship to use business funds for personal expenses and to charge those withdrawals to "cash" or "draw," the evidence was not irrelevant. The defendant told an FBI agent that the bribery funds came from company bank accounts. The government argues, and we agree, that the evidence was relevant to show a poten-

tial source of the bribery funds and to support an inference that the defendant, as the company bookkeeper, was well aware of the purpose for which the money was used. The existence of an alternative explanation for the defendant's behavior does not render otherwise probative evidence irrelevant.

■ The defendant also argues that a discrepancy in her tax returns—where she listed her occupation as "housewife" when she actually worked without pay as a full-time secretary at the company—was also irrelevant. Since the evidence reflected directly on her honesty, the district court did not abuse its discretion in allowing its admission. The significance of the evidence was a question for the jury to resolve.

■ Finally, the defendant contests the amount of restitution imposed as a condition of probation. After conviction, the district court placed the defendant on five-year probation with the condition that she repay Cook County $100,000 as restitution for the losses the County sustained from the scheme. The defendant argues that the County was not an "aggrieved party" under 18 U.S.C. § 3651. In pertinent part, that statute provides:

> While on probation and among the conditions thereof, the defendant—
>
> \*    \*    \*    \*    \*    \*
>
> May be required to make restitution or reparation to aggrieved parties for actual damages or loss caused by the offense for which conviction was had . . . .

The defendant contends that the County suffered no actual loss because it recouped revenues lost in the assessment reductions by increasing tax assessments for other county property owners. The defendant's argument ignores the fact that the conspiracy deprived Cook County of tax revenues it was lawfully due. There is no basis in the statute or case law for concluding that the victim of a fraud is not an aggrieved party simply because he obtains compensation for his loss from another source. The County would have been no less an aggrieved party had a private bonding company or other insurer reimbursed it for the losses suffered from the dishonesty of its employees.

Moreover, the real victims of the fraud were property owners in Cook County. Just as the defendant's fraud did not diminish tax revenues because the County collected the deficiency from other property owners, neither will requiring the defendant to repay those funds provide the County a windfall. Presumably, those funds will lessen the current tax levy and reduce the present tax burden of local property owners. Consequently, at a minimum, the County is an aggrieved party insofar as it stands in the shoes of the victims and may accept the funds in trust for local property owners.

■ Finally, the defendant argues that the district court abused its discretion, *see United States v. Davies*, 683 F.2d 1052 (7th Cir.1982), in arriving at the $100,000 restitution figure. Any amount to be paid in restitution must be obtained by accurate computation and cannot exceed the amount of loss actually caused. *United States v. Hoffman*, 415 F.2d 14, 21–22 (7th Cir.), *cert. denied*, 396 U.S. 958, 90 S.Ct. 431, 24 L.Ed.2d 423 (1969). The government originally sought $367,000 in restitution for fees the company collected in the scheme. The government derived that figure from calculations based on the amount of fraudulent assessments the R.M. Lynch Company obtained from 1975 through 1979. The government asserted that nearly all assessments the company obtained were fraudulently processed. On the basis of the R.M. Lynch Company's standard fee, which was a percentage of the tax reduction obtained, the government estimated the County lost $1.4 million in revenue and the defendant collected more than $367,333 in fees.

■ Despite the defendant's argument to the contrary, the restitution award is adequately supported in the record. The statutory measure of damages is the amount of loss an aggrieved party actually suffered. 18 U.S.C. § 3651. Here, the government showed the County lost over $1.4 million in property tax revenues. The

defendant does not challenge that contention. The defendant contends only that the base figures in the government's calculations were misleading because most of the company's fees were actually uncollected. Though uncollected, the fees nevertheless indicated that R.M. Lynch Company had fraudulently obtained a property tax reduction and the County had lost those revenues.[5] The fact that the company never profited from its efforts in these cases is irrelevant, for the measure of restitution damages is "based ... on the loss to the victim of the fraud," not the benefit to the perpetrator of the fraud. *Davies*, 683 F.2d at 1055. Thus, the district court did not err in calculating the amount of restitution.

For the foregoing reasons, the conviction is AFFIRMED.

---

5. The defendant argues further that, although most reductions were obtained illegitimately through bypassing administrative channels at the Board, this fact alone does not establish that the reductions were undeserved. She argues that the district court should have calculated the amount of restitution by considering only fees collected in cases where the government proved that reduction would not have been obtained had the R.M. Lynch Company followed correct procedures at the Board. We disagree. The company successfully obtained reductions in over ninety-five percent of the cases appealed to the Board. The district court did not abuse its discretion in assuming that most reductions, fraudulently obtained, were undeserved.