**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Peter PECO and Edwin Hoffman,**
**Defendants-Appellants.**

Nos. 85–1162, 85–1163.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 18, 1985.
Decided Feb. 26, 1986.

Nicholas A. DeJohn, Nicholas A. DeJohn & Assoc., Ltd., Patrick A. Tuite, Chicago, Ill., for defendants-appellants.

Patty Stembler, Appellate Sec., Crim. Div., Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Before CUDAHY and RIPPLE, Circuit Judges, and SWYGERT, Senior Circuit Judge.

RIPPLE, Circuit Judge.

Following a jury trial, Peter Peco and Edwin Hoffman were convicted of conspiracy to possess and distribute cocaine in violation of 21 U.S.C. § 846. Peco also was convicted of cocaine distribution in violation of 21 U.S.C. § 841(a)(1), and Hoffman was convicted of carrying a firearm during the commission of a felony in violation of 18 U.S.C. § 924(c)(2). Alleging that certain trial errors affected the jury's decision to convict, Peco and Hoffman filed this timely appeal. We affirm the convictions.

I

The government's case at trial consisted of evidence which, if accepted by the jury, tended to show that the appellants were involved in a cocaine ring with several other individuals, including a Mario D'Andrea who sold cocaine out of a garage in Chicago. According to the government's submission, Peco purchased cocaine from D'Andrea with the financial assistance of Hoffman.

In May or June 1981, Drug Enforcement Agency (DEA) Agent Raleigh Lopez met Doug Hardin, a Chicago "career criminal." Hardin became an informer for the DEA. On September 2, 1981, Hardin introduced Agent Lopez to Peco as "Tony Herrera," a pseudonym indicating a connection to a Mexican drug family. During the course of the transaction, they discussed D'Andrea. The deal was consummated—one ounce of cocaine for $2500.

On September 6, through Hardin, Agent Lopez and Peco met again. Peco asked Agent Lopez to sell some cocaine for him and to find a volume buyer. He also indicated that he was dissatisfied with D'Andrea. Peco gave Agent Lopez one ounce of cocaine for which Lopez was to pay $2400; he told Lopez to stay in touch with Hardin. On September 8, having withdrawn $2400 in government funds, Agent Lopez and a female DEA agent, posing as his girlfriend, met Peco at a fast food restaurant and paid him for the ounce of cocaine. Peco identified Hoffman as his financier and promised to deliver one ounce of cocaine to Lopez.

Peco also told Agent Lopez that an associate was bringing a kilogram of cocaine back to Chicago and discussed Agent Lopez' potential "buyer."

On September 10, in a Chicago restaurant parking lot, Hardin introduced two more DEA agents to Peco. The two agents, posing as cocaine dealers, offered to sell Peco two ounces of a substance they claimed was cocaine. They refused to allow Peco to sample the substance until he showed them the purchase money. The two agents and Peco then walked over to the van in which Hoffman was seated. Hoffman showed the agents the cash and asked if the "dealers" would be able to deliver five kilograms of cocaine each week. The surveilling agents then arrested the participants, including the defendants. At the time of the arrest, Hoffman was carrying a gun, and another loaded gun was found in his van. On October 1, following a confrontation, Agent Lopez shot and killed D'Andrea.

At trial, neither Peco nor Hoffman testified. Hoffman's defense counsel attempted to show that Hoffman, who collected stock cars, believed that he was purchasing a car on the night of his arrest. Evidence was submitted which tended to show, and counsel argued, that Hoffman was an honest businessman with a hobby of stockcar racing—a hobby which requires large quantities of cash since most transactions in that area are conducted on that basis. Peco's attorney showed that Peco worked for D'Andrea and stored a race car in D'Andrea's garage. However, the defense was based, in large measure, on attacks on the credibility of the government's witnesses. The principal allegation was that Lopez, seemingly without authority, promised Hardin immunity from prosecution for his past acts which included eight murders, two arsons, two kidnappings, thefts and narcotics offenses.

On appeal, Peco and Hoffman urge us to find that certain behavior by the prosecutors at their trial denied them a fair trial. They claim that the scope of the government's redirect examination of Agent Lo-

pez impermissibly exceeded the scope of the cross-examination. They allege that Lopez' testimony regarding alleged "death threats" aimed at him and his family prejudiced the jury against them. Further, they claim that the government's improper closing rebuttal remarks impaired the likelihood that they would receive a fair trial. We shall examine each of these issues separately.

## II

Appellants' first claim on this appeal is that the redirect examination of Agent Lopez relating to death threats against him and his family was irrelevant, prejudicial and violative of the hearsay rule. In reviewing these claims, we are mindful "that the district court has broad discretion to assess the relevancy of proffered evidence." *United States v. West*, 670 F.2d 675, 682 (7th Cir.), *cert. denied*, 457 U.S.

1139, 102 S.Ct. 2972, 73 L.Ed.2d 1359 (1982). Our deference to the evidentiary decisions of the trial judge is based on the fact that "trial judges are much closer to the pulse of a trial than we can ever be...." *United States v. Juarez*, 561 F.2d 65, 71 (7th Cir.1977), *quoted in United States v. Covelli*, 738 F.2d 847 (7th Cir. 1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 211, 83 L.Ed.2d 141 (1985). Therefore, we will reverse an evidentiary ruling only if we find that the district court clearly abused its discretion. *Id.* The appellants' contention can be assessed adequately only in the context of the entire record. It is necessary, therefore, that we explore rather fully the trial transcript at this point.

As we noted in the foregoing paragraph, the appellants' defense was based, to a great extent, on an attack on the credibility of the government's witnesses.[1] Special

---

1. In his opening statement, Hoffman's counsel argued:

Now as to that meeting, that event, the prosecutors attempt to paint it as a very cut-and-dried affair: The agents set up a big sale of cocaine, Mr. Hoffman and Mr. Peco come there and they get caught attempting to buy the cocaine—simple, straightforward.

There is only one problem, ladies and gentlemen, it didn't happen that way. The evidence in this case will show that there is nothing simple or straightforward about it. The evidence in this case will show that the federal drug agents involved in this case make incredible deals with people who can only be described as the scum of the earth, large-scale drug dealers as well as a man who was a murderer, an arsonist and a kidnapper.

The evidence will show that instead of putting these people in jail and throwing away the key, the federal drug agents acted to reduce their jail time, to pay them money, to give them immunity, and to put them out on the street where they could ensnare innocent people like Mr. Hoffman in their web of evil.

The evidence will also show that these same agents then lied and manufactured evidence in order to justify the deals they had struck, and in the process they deceived the attorneys from the Department of Justice.

Now, ladies and gentlemen, these are not easy things to accept. We do not like to think that agents of our government would act in this manner, but the evidence in this case will show that that is exactly what they did.

The whole key to this case as far as Mr. Hoffman is concerned is an individual about whom the prosecutor did not say very much,

this man Robert Douglas Hardin. He described him, said he was present at certain events, but sort of made him out to be a minor character in this whole scenario.

Well, ladies and gentlemen, Robert Douglas Hardin is the key to this entire case. The evidence will show that in the early summer of 1981, Hardin was a desperate man. He had just been convicted in federal court of dealing in drugs. This wasn't his first conviction, this was his third conviction of crimes during his adult life. So he was a three-time loser. And on top of that he had more federal drug charges pending against him at this time. So he needed something, he needed a way out, and he particularly needed a way out because the crimes for which he had been convicted were only a small portion of the evil deeds he had done.

\*     \*     \*     \*     \*     \*

Now, this was a sensational deal for Hardin. Instead of going to jail for the rest of his life, he got a relatively small sentence and he got paid money, but he had to do something for Agent Lopez. He had to do something to make Agent Lopez look good, something to boost up Agent Lopez's statistics, and that is how this case—that is how the meeting at the Town & Country Restaurant came about.

\*     \*     \*     \*     \*     \*

What did happen was that before these agents went out to the Town & Country Restaurant they had already decided what they wanted to do, and what they wanted to do was to seize Mr. Hoffman's van and to seize his money, and that is exactly what happened.

emphasis was placed on Lopez' promise of immunity to Hardin—a promise that was unauthorized and unusually broad in its scope. On cross-examination of Lopez, Hoffman's counsel inquired at length about this matter:

Q. Agent Lopez, you gave Mr. Hardin immunity, didn't you?

A. Yes, sir.

Q. After October 1, 1981, you debriefed him, didn't you?

A. Yes, sir, I did.

Q. You promised him what you told him would not be used against him, didn't you?

A. Yes, sir, I did.

    *     *     *     *     *     *

Q. And you knew at the time that was giving him immunity for any crimes he told you about, didn't you?

A. Yes, sir.

Q. And then he proceeded to tell you that he had participated in eight murders, didn't he?

A. Yes, sir, he did.

Q. And two kidnappings?

A. Yes, sir.

Q. And two arsons?

A. Yes, sir.

Q. He was in a stolen car ring?

A. Yes, sir.

Q. Numerous other crimes against property?

A. Yes, sir.

Q. And many drug deals, correct?

A. Yes, sir.

Q. You didn't have authority to promise him immunity on that occasion, did you?

A. Yes, sir, that is correct.

    *     *     *     *     *     *

Q. You knew at that time that the Justice Department was the only organ of the Federal Government who could grant someone immunity, didn't you?

A. Yes, sir, I did.

Q. And you didn't bother to consult with the people in the Justice Department about your promise of immunity, did you?

A. That is correct, sir.

Tr.Tr. 437–38.

Hoffman's counsel then asked Lopez whether Hardin was given immunity as a reward for his part in the investigation. Tr.Tr. 439. Counsel then questioned Lopez about the arrest itself. After gleaning from Lopez that Hoffman's van and his $50,000 were seized and forfeited pursuant to the arrest, he intimated that effecting the seizure was the entire basis for the DEA's investigation of Hoffman—the intimation being that the charges against Hoffman were trumped up to justify the seizure of the money and the expensive van:

Q. Now, let me talk—let me ask you a few questions about this seizure of the van and the money.

Now, is it the usual procedure after you make a seizure for the Government to bring what is called a civil forfeiture action in federal court?

A. Yes, sir.

Q. And if no one opposes the forfeiture, does the Government get to keep what you seized?

A. Yes, sir.

Q. And this was a nice van that you had seized from Mr. Hoffman, wasn't it?

A. Yes, sir, it was.

Once they got out there they parked the van, Mr. Hardin walked up to Mr. Hoffman's van, Agent Arreguin came around and a large number of agents descended on Mr. Hoffman and Mr. Peco and they seized the money, they seized the van and then, ladies and gentlemen, they left them there—no arrest, no charges brought against Mr. Hoffman. In fact, no arrest, no charges for almost three years.

Now, what happened was this operation at the Town & Country, this seizure of the van and money was something that was designed to make Agent Lopez and his fellow agents look good, because after a seizure like that the Government goes into court and brings a case to have those items forfeited to the Government, and that is what happened here, and if no one opposes that forfeiture action, the Government gets to keep it, and that is a real feather in Agent Lopez's hat, that he was able to seize $50,000 in cash and this van. Tr.Tr. 22–27.

Q. Have you had vans or automobiles forfeited in the past?

A. Yes, sir.

Q. And are the agents able to keep the vans after they are forfeited, not personally, but to use them in their Governmental activities?

MR. EVON: I object. I fail to see any relevance to the seizure and forfeiture action. The civil action is collateral to this case.

MR. HANDLER: I think it is very relevant to what we have here, Judge, because it goes to the motive for this whole action.

THE COURT: I will let him answer.

BY THE WITNESS:

A. Repeat the question, please.

MR. HANDLER: Could the question be read back, please?

(The question was read.)

BY THE WITNESS:

A. On occasions.

*     *     *     *     *     *

Q. And if this forfeiture of this particular van and the $50,000 came off, that would be a nice feather in your cap, wouldn't it?

A. No, sir, it would not.

Q. Mr. Hoffman did oppose the forfeiture, didn't he?

A. I don't know, sir; I am not involved in that civil proceeding.

Tr.Tr. 442–43.

After Hoffman's counsel finished questioning Lopez, Peco's counsel cross-examined him regarding the death of D'Andrea on October 1st:

Q. Now, prior to you shooting and killing Mr. D'Andrea, Mr. D'Andrea had made approximately five sales of cocaine to you, is that right?

A. Yes, it is.

Q. And at the time that you shot him, he fell foward [sic] and was found lying on his face, is that right?

A. That is correct.

*     *     *     *     *     *

Q. And likewise all records from the gas station were seized, were they not, all the papers belonging to Mr. Mario D'Andrea were seized at that time?

A. I don't know.

*     *     *     *     *     *

Q. Well, you said that you used the telephone in Mr. D'Andrea's gas station a number of times?

A. Yes.

Q. You didn't use it on October 1st, 1981, to call an ambulance for him, did you?

A. No, ma'am.

Tr.Tr. 452.

When the cross-examination of Lopez was concluded, the district judge called a sidebar conference to inquire about the scope of the redirect examination in light of defense counsel's inquiry into the killing of Mario D'Andrea. Tr.Tr. 456. At that time, the assistant United States attorneys informed the judge that they would ask Lopez to describe the incident and to explain why Hardin was given the extraordinary grant of immunity. Having received no objection from defense counsel, the judge stated "I don't like to go into a lot of extraneous material *but the door has been opened.*" Tr.Tr. 457 (emphasis supplied). At this point, counsel for the appellants did not object. Tr.Tr. 456–57.

On redirect, the government was able to elicit an account of Agent Lopez' initial contacts with Hardin, a description of the extent of the investigation, a statement of Hardin's early cooperation and Lopez' understanding of the government's commitment to him.[2] Tr.Tr. 459–62, 463–64. Lopez then testified about his initial contacts with D'Andrea. Tr.Tr. 465–66. At the insistence of defense counsel, a sidebar conference was held and the proffered testimony restricted. Tr.Tr. 469. A full description of the circumstances surrounding

2. Lopez testified that, in June 1981 the only promise made to Hardin "was that his cooperation would be made known to the United States Attorney's office and to any court...." Tr.Tr. 464–65.

the shooting of D'Andrea followed without objection. Tr.Tr. 470–78. Only when the government brought out that' Lopez had been cleared of any wrongdoing did defense counsel object, but the court admitted this evidence. Tr.Tr. 478. During this line of questioning, the assistant United States attorney was also able to elicit that medical assistance had indeed been requested for D'Andrea from the Chicago Heights Police Department. Tr.Tr. 479.

Agent Lopez then testified · about the government's relocation of the informant Hardin but the trial judge, upon objection from the defense, refused to admit testimony concerning the murders of earlier informants—despite the prosecution's submission that such testimony was necessary to rebut the defense's argument that the government's concern for Hardin arose from a desire to elicit favorable evidence and not out of a legitimate concern for his safety.

Thereafter, the focus of the redirect shifted to the grant of immunity to Hardin. Several sidebar conferences were held. Tr.Tr. 478–85. The district judge overruled the defense's objection to the line of questioning, and the following line of testimony ensued:

Q. Agent Lopez, after the shooting and death of Mario D'Andrea on October 1st, 1981, did you learn of any reprisals based upon that fact, that shooting?

A. Yes, sir, I did.

Q. And from what sources did you learn that, sir?

A. *After the shooting my wife received a phone call that they knew where I lived and they wanted Doug Hardin and I. After that I learned from three other independent sources of information that there was a contract to kill Doug Hardin for 25,000 and a contract to kill me for 50,000.*

Q. What, if any, effect did this have on you and your family, sir?

A. Oh, a lot of effect.

After I learned about the phone call, I tried to sell my house, to move out. It is still for sale. I had policemen by my house. My wife was upset, of course, and the kids were all nervous and excited.

\*      \*      \*      \*      \*      \*

Q. *At that time, Agent Lopez, did you feel that there was any single person who could help you with this threat problem?*

A. Yes, there was only one.

Q. Who was that?

A. Unfortunately it was Doug Hardin.

Q. When you subsequently debriefed Hardin as to numerous criminal acts including many acts of murder, kidnapping, whatever, did he make any demands upon you as a condition for his cooperating fully and telling you everything, so to speak?

A. Yes, he did.

Q. What was that demand?

A. He demanded that he would give me all the information I wanted if I would provide him with the statement that the information he gave me was for intelligence purposes only and not to prosecute him, *and that he would provide me with the information of the people who work in that area, who have committed previous homicides and how they would do it.*

Tr.Tr. 488–89 (emphasis supplied). Lopez then admitted that he had not sought the permission of the Justice Department before granting immunity to Hardin (although he did seek the permission of his supervisor). The questioning then continued:

Q. Did you expect to hear from Hardin the litany of horrors and felonies that he told you?

A. No.

Q. What did you expect?

A. I presumed that I would hear about narcotics dealings that he had had and about other people involved in various homicides in that area, and the people that would be working for that network of people in the Heights area.

Q. Mr. Lopez, several times counsel in this case has referred to a feather in

your cap; did you get a feather in your cap as a law enforcement officer based upon this investigation, this killing of this man?

A. No, sir, the only thing I got—

MR. HANDLER: Judge, I object. The feather in the cap, at least to which I referred, was the September 10th, 1981 incident at the Town & Country. That is unfair.

THE COURT: Yes, sustained.

BY MR. EVON:

Q. What did you get out of this investigation, sir?

A. A lot of aggravation, problems at home, threats, almost got my head blown off, nothing but problems.

Q. Are you in fact in fear today, Agent Lopez?

A. Beg pardon?

Q. Are you in fact in fear today?

A. Somewhat.

Tr.Tr. 490–91.

Appellants' principal argument[3] is that this questioning is excludable under Fed.R. Evid. 401 and 403. They claim that the probative value of the death threat testimony was substantially outweighed by its prejudicial effect and, therefore, its admission resulted in an unfair trial. Fed.R. Evid. 403. The appellants claim that the death threat testimony raised an inference that they were responsible although no statement linking them to the threats was made during the redirect.

■ It has long been recognized in this circuit that the scope of the redirect is committed to the discretion of the trial court. *United States v. Touloumis*, 771 F.2d 235, 241 (7th Cir.1985); *United States v. Mackey*, 571 F.2d 376, 383 n. 9 (7th Cir.1978). Thus, the scope of our review is limited. The decision of the district court regarding the redirect will be overturned only if there is a showing of abuse of discretion. *Mackey*, 571 F.2d at 383 n. 9. We have recognized as a general principle that, questions eliciting a response that is damaging to defendant, do not affect the propriety of the court's decision as to the proper scope of the redirect. *Id.* On the other hand, as the Second Circuit has explicitly noted, "the potential prejudice from death threats may be great.... Thus, the government must have an important purpose for the evidence in order to satisfy the Rule 403 balancing test." *United States v. Qamar*, 671 F.2d 732, 736 (2d Cir.1982). Yet, "death threats, just as other potentially prejudicial evidence, are to be judged by 'the normal balancing processes of Fed.R. Evid. 403 balancing.'" *Id.* (quoting *United States v. DeLillo*, 620 F.2d 939, 944 (2d Cir.), *cert. denied*, 449 U.S. 835, 101 S.Ct. 107, 66 L.Ed.2d 41 (1980)).

At the outset, we note that the entire redirect was carefully supervised by the district judge. His approach was a cautious and even-handed one. Here, the trial judge had to take into account the defense's approach to its cross-examination of Agent Hardin. It was, as the defense signaled in its opening statements, intended to create the inference that the government's agents were ruthless men who charged innocent people with crimes just to obtain certain desirable property through the forfeiture process and to advance their own careers—and who murdered innocent parties to cover their tracks. We cannot, under these circumstances, fault the district judge for having a somewhat sympathetic ear when counsel for the government submitted:

---

**3.** Appellants also submit that Lopez' testimony that he had been told by independent sources that there were contracts out on his life and that his wife had threatened divorce was inadmissible hearsay. We are unpersuaded that evidence such as that given by agent Lopez constitutes hearsay within the meaning of Fed.R.Evid. 801. According to Fed.R.Evid. 801(c), for a statement to be hearsay, it must be offered to prove the truth of the matter asserted. Certain statements, which evidence the effect of the statements on the mind of the listener, therefore, are not hearsay. "Statements may ... be admitted to show ... states of mind such as knowledge, motive, fear, or reasonableness in taking particular action." 4 J. Weinstein & M. Berger, WEINSTEIN'S EVIDENCE ¶ 801(c)[01] (1984). In this case, Lopez' testimony was offered not for its truth but to explain his motivation—fear—for granting Hardin immunity.

Judge, we had no intention of getting into any of this and we didn't in our case. They have made the accusations. This man is being accused of murder, or violation of his oath of office, accused of perjury, manufacturing a case out of thin air, of setting up innocent people.

This man has to have an opportunity on the stand to explain what he did and why and what factors were working on him in his mind as to his family and his fears back in 1981 that led him to make this horrible mistake.

Tr.Tr. 486.

■ We cannot say that the district judge abused his discretion in deciding that the redirect testimony was relevant in light of the defense's cross-examination. Defense counsel opened the door by inquiring into the relationship between Agent Lopez and Hardin. They cannot now complain on appeal because Lopez was given the opportunity to further explain the reason for his dealings with Hardin. As we have noted in the past, "[w]hen a party opens up a subject, even though it may not be strictly relevant to the case, he cannot complain on appeal if the opposing party introduces evidence on the same subject." *United States v. Carter,* 720 F.2d 941, 948 (7th Cir.1983) (citation omitted); *see Touloumis,* 771 F.2d at 241; *United States v. Chaimson,* 760 F.2d 798, 810 (7th Cir.1985); *United States v. Lynch,* 699 F.2d 839, 844 (7th Cir.1982); *United States v. Allain,* 671 F.2d 248, 252–53 (7th Cir.1982). Had the defense not inquired into the relationship between Lopez and Hardin, the prosecutor would not have had to explain Lopez' motives in granting immunity. Thus, the defense opened the door to the inquiry. On redirect, the government simply allowed Lopez to negate these inferences by fleshing out the details of the shooting of D'Andrea and the relationship with Hardin. This reassertion of Lopez' credibility was essential to the prosecution's case, which was based, in large part, on Lopez' testimony. We cannot say that the district court abused its discretion in receiving this testimony into evidence.

### III

Appellants also assert that the prosecutor's rebuttal argument contained improper arguments that constitute reversible error. Specifically, Peco and Hoffman contend that, by certain comments, the prosecutor vouched for the credibility of the prosecution and its witnesses, injected personal views and made inflammatory suggestions to the jury and, on one occasion, "implicitly commented on Hoffman's failure to take the witness stand in his own defense." Appellants' Br. 29 n.*.[4]

In evaluating these contentions, we are mindful that the objective of our inquiry is to determine the fairness of the defendants' trial. Convictions produced by a fair—albeit imperfect—trial may not be overturned because of our disapproval of the lack of professionalism in counsel's advocacy. There are other ways to address that problem when it is determined to exist.[5] We are also mindful that the Supreme Court has recently stated that "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements ... must be viewed in context; only by so doing can it be determined whether the prosecutor's conduct affected the fairness of the trial." *United States v. Young,* —— U.S. ——, 105 S.Ct. 1038, 1044, 84 L.Ed.2d 1 (1985). We also note that the Court suggested that the

---

**4.** Appellants also suggest, in a footnote to their brief, that the prosecutor implicitly commented on Hoffman's failure to take the witness stand in his own defense. Tr.Tr. 721–22. The trial judge, after reviewing the testimony, overruled the objection. Our own review of the testimony convinces us that he was correct.

**5.** Many sanctions are available to the district judge in this regard. These include cutting off an inappropriate line of argument, contempt penalties, referral to the appropriate grievance committee for attorney discipline or suspension. As the Second Circuit has noted, "the message of a single 30-day suspension from practice would be far clearer than the disapproving remarks in a score of appellate opinions." *United States v. Modica,* 663 F.2d 1173, 1185 (2d Cir.1981). *See generally* B. GERSHMAN, PROSECUTORIAL MISCONDUCT §§ 13.1–13.7 (1985).

so-called "invited reply" rule can be helpful in assessing the fairness of the trial. *Id.* This approach, set forth in *Lawn v. United States,* 355 U.S. 339, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958), was described by the *Young* Court in the following terms:

> Inappropriate prosecutorial comments, standing alone, would not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding. Instead, as *Lawn* teaches, the remarks must be examined within the context of the trial to determine whether the prosecutor's behavior amounted to prejudicial error. In other words, the Court must consider the probable effect the prosecutor's response would have on the jury's ability to judge the evidence fairly. In this context, defense counsel's conduct, as well as the nature of the prosecutor's response, is relevant.

105 S.Ct. at 1045. However, the Court hastened to add—and we repeat for emphasis:

> In retrospect, perhaps the idea of "invited response" has evolved in a way not contemplated. *Lawn* ... should not be read as suggesting judicial approval or—encouragement—of response-in-kind that inevitably exacerbate the tensions inherent in the adversary process. As *Lawn* itself indicates, the issue is not the prosecutor's license to make otherwise improper arguments, but whether the prosecutor's "invited response," taken in context, unfairly prejudiced the defendant.

*Id.* As this court stated recently:

> Properly understood that doctrine does not condone the prosecutor's descending to the level of defense counsel or enact the proposition that two wrongs make a right; it merely recognizes that the impact on the defendant from the prosecutor's misbehavior may be less if the defendant's counsel aroused the jury against the prosecutor.... The prosecutor's misconduct may just have offset the defense counsel's misconduct, thus pro-

ducing no net effect on the jury's deliberations.

*United States v. Mazzone,* 782 F.2d 757, 763 (7th Cir.1986) (citation omitted).

■ In short, while the prosecutor's remarks must be weighed against the defense's "opening salvo," *Young,* 105 S.Ct. at 1045, such an approach does not amount to giving "the prosecutor 'a hunting license exempt from ethical constraints on advocacy.'" *United States v. Goodwin,* 492 F.2d 1141, 1147 (5th Cir.1974) (citation omitted), *quoted in* B. GERSHMAN, PROSECUTORIAL MISCONDUCT § 13.2(d) (1985). If the prosecutor's rebuttal remarks exceeded the permissible bounds of advocacy and defense counsel raised a timely objection, a reviewing court could reverse an otherwise properly obtained conviction only if it concluded that the error was not harmless beyond a reasonable doubt. *United States v. Hasting,* 461 U.S. 499, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983). Against this background, we proceed to assess the appellants' contentions.

As the appellants suggested,[6] we begin our analysis of these contentions by a review of the government's entire closing argument. Of course, that presentation cannot be evaluated in a vacuum. It is necessary " 'to examine the allegedly prejudicial remarks of the prosecution in the context of the trial as a whole.'" *United States v. Zylstra,* 713 F.2d 1332, 1340 (7th Cir.), *cert. denied,* 464 U.S. 965, 104 S.Ct. 403, 78 L.Ed.2d 344 (1983) (quoting *United States ex rel. Garcia v. Lane,* 698 F.2d 900, 902 (7th Cir.1983)).

■ First, we must evaluate the challenged remarks in light of the other closing addresses. After the government's initial summation, counsel for both defendants addressed the jury. Defense counsel for Hoffman offered his closing argument first. He stressed the same themes which had predominated in his opening address to the jury at the beginning of trial.[7] He attempted to portray Lopez and the other government agents involved as lying,

---

**6.** Appellants' Br. 22.

**7.** *See supra* note 1.

scheming, disreputable men who murdered people who interfered with their plans and made promises to felons out of desperation. The argument began with an inference that the agents involved were liars and that the entire reason for the meeting with Hoffman and Peco was to seize Hoffman's van, not to effectuate a valid arrest:

> The testimony of Sheldon Skidelsky and George Venturella ... shows the desperation of the Government and how far they will go to obtain a conviction at any cost.
>
> *   *   *   *   *   *
>
> [I]t wasn't a reverse undercover operation. They were there to seize the van and to seize the money.
>
> *   *   *   *   *   *
>
> But the lie began to unravel. This is what we will see again and again, Raleigh Lopez's lies unraveling and his fellow agents sticking up for one of their own, trying to change things, change the story a little bit....
>
> *   *   *   *   *   *
>
> Now, if they were dealing with big-time drug dealers, couldn't Peco have a gun? Couldn't he have something dangerous on him? They never searched him and why? Because they don't think these men are drug dealers. They are not interested in investigating crime. They are interested in seizing that van and seizing that money, which is what they testified they intended to do before they went out there.

Tr.Tr. 672, 678, 680, 681.

Defense counsel soon moved to a discussion of the relationship between Hardin and Lopez. He argued that Hardin was not called as a witness because the government was trying to hide him and hide from the jury the unusual deal that had been struck between Lopez and Hardin:

> Now, the final thing that the Government didn't do in connection with this case, that is very strange, is that they did not call Hardin as a witness....
>
> The reason, ladies and gentlemen, is that they were trying to hide him. They

didn't want you to see him. They knew you'd be revolted by him....

> But that isn't the only reason they didn't call him. They didn't want you to know the despicable deal that Raleigh Lopez struck with Hardin. Hardin, as the evidence has shown, received over $65,000 in payments. He received immunity for all of these murders, arsons, kidnappings. He got his jail sentence reduced on his narcotics charge and he got put in protective custody. And what is so incredible about this is Agent Lopez puts himself above the law in doing it. He admitted on the witness stand that he did not have the authority to promise immunity to Hardin. He knew that only the Justice Department could do it, and he said that he didn't go to the Justice Department.
>
> Of course, Agent Lopez tried to justify his own actions. *He came in here, he got up on that witness stand and he told you an absolutely heartrending story about this anonymous call that his wife received threatening his life, how he lived in tremendous fear, put his house up for sale, and how he thought that Doug Hardin was the only person he could turn to. His voice almost cracked as he told you about this terrible period of his life.*
>
> Ladies and gentlemen, what we saw from this witness stand was all a shameful pack of lies.
>
> *   *   *   *   *   *
>
> If there was any danger to Raleigh Lopez, he had all of the resources of the United States Government at his disposal to deal with them. He didn't need to rely on a man like Hardin. He had all the power of the Government right there for the asking, and the reason he didn't ask for it is because he knew he wasn't in danger. The real reason that Hardin got immunity was as a reward, a reward for what he had done for Lopez. The information about Hardin's past wasn't necessary for any ongoing investigation. D'Andrea was dead, Hardin wasn't work-

ing in the field anymore and this debriefing occurred after October 1st.

\* \* \* \* \* \*

The whole purpose of that debriefing was to make sure that no one would ever prosecute Doug Hardin for all of his terrible crimes, and it worked. They broke the law and they got away with it. That is what they didn't want to come to light and that is why they didn't call Hardin.

Tr.Tr. 685–86 (emphasis supplied), 688, 689.

Having finished arguing that there was really no drug investigation at all, Hoffman's counsel proceeded to suggest to the jury why they should believe that Lopez and his fellow agents lied:

We don't like to think that agents of our Government would do things like this, would lie, would then cover up, and it is certainly not common, thank God, but it has happened before. We all recall a little over 10 years ago how it happened, how people close to the President of the United States lied, covered up, and the Watergate break-in. Things like this happen unfortunately, and that is what has happened here on a minor scale.

Agent Lopez was in charge of this operation. He created this whole thing and now his fellow agents, the people in his group, are trying to protect one of their own.

Tr.Tr. 691.

Following this argument, defense counsel returned to what they claim was the real reason for the charges against Hoffman—the seizure of his van and $50,000. "We know that the agents went out there on September 10th intending to seize the van and the money and not make any arrests, and we know the agents' story about what happened there doesn't add up." Tr.Tr. 694. Finally, counsel began to argue that Hoffman was the victim of a monstrous conspiracy involving government agents and felons:

[W]hat happened here in this case is truly scary. It is something that should keep each one of you awake at night. What we have here is Government agents placing themselves above the law and making a deal with a man like Hardin, a man who is a murderer, committed arson, kidnapping, drug deals, and they make this deal with him so that in a couple of years he can get back on the street.

\* \* \* \* \* \*

The agents have manufactured evidence, they have twisted the truth from this witness stand, all to support these deals, and while the Government was protecting and paying money to these incarnations of evil, here sits Ed Hoffman, a businessman, race car driver, on trial in a case that will affect the rest of his life and the rest of his family's life.

Tr.Tr. 696, 697.

After counsel for the codefendant, Peter Peco, addressed the jury,[8] counsel for the government[9] began his final argument. We shall set forth those sections which form the bases of the defendants' principal contentions on appeal. Toward the beginning of the address, the prosecutor told the jury:

What you have heard, quite frankly, is a shameful and vicious attack on these agents and it goes beyond the proper limits of advocacy. We are professionals. We are not here to get gold stars or points, we are here to attempt to do justice. Any inference, any argument, any attack made that the Department of Justice, that its agents, that a case is presented to frame innocent persons is

---

**8.** This address (Tr.Tr. 698–718) dealt principally with the evidence against the defendant Peco and, while counsel argued that Agent Lopez' testimony was not believable (Tr.Tr. 702), the attack on the motivations of the government was markedly subdued by comparison to the address of co-defense counsel.

**9.** This argument was not given by the attorney who had delivered the first summation on behalf of the government.

the most vicious, despicable and callous act that any person can do.

\* \* \* \* \* \*

The evidence in this case shows that Pete Peco is a cocaine dealer and that Hoffman is his backer....

What do you think they were doing in that Town & Country parking lot under those circumstances?

Hoffman spent five times the average salary of the average working man per year on the toys of his hobby. Now, you have been told that these agents have engaged in a conspiracy to fool everybody. Well, assume that they are liars, assume that they are bad guys, are they stupid or are they naive? Do you think these people are without experience, that they are going to beat the system, beat their supervisors, fool us, fool a court, fool a grand jury and fool you?

Tr.Tr. 719, 728. Appellants claim that the prosecutor had vouched for the credibility of the prosecution:

The personal opinion of the court and grand jury, as well as that of the prosecutor, is not proper subject matter for closing argument. The argument was grossly inaccurate; neither the court, the grand jury, nor anyone else had ever found that the defense was unworthy of belief or that each agent was truthful. This genre of closing argument attempted to invade the province of the jurors as finders of the ultimate facts. It was argued that the jurors should abdicate their responsibility as jurors and abide by the view of the "professionals," that is, the prosecutors, supervising agents, the grand jury, and the court.

Appellants' Br. 25.

In *Young,* the Supreme Court noted:

The prosecutor's vouching for the credibility of witnesses and expressing his personal opinion concerning the guilt of the accused pose two dangers: such comments can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to

be tried solely on the basis of the evidence presented to the jury; and the prosecutor's opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence.

105 S.Ct. at 1048. However, here defense counsel's closing argument was a clear attack on the integrity of the government and its witnesses. We have held that, where defense counsel "struck the first blow" by impugning the integrity of the government, "[t]he Government's response was invited and within the bounds of proper argument." *United States v. West,* 670 F.2d 675, 689 (7th Cir.), *cert. denied,* 457 U.S. 1124, 102 S.Ct. 2944, 73 L.Ed.2d 1340 (1982); *see United States v. Alpern,* 564 F.2d 755, 760 (7th Cir.1977); *United States ex rel. Clark v. Fike,* 538 F.2d 750, 758–60 (7th Cir.1976), *cert. denied,* 429 U.S. 1064, 97 S.Ct. 791, 50 L.Ed.2d 781 (1977); *United States v. Isaacs,* 493 F.2d 1124, 1164–66 (7th Cir.), *cert. denied,* 417 U.S. 976, 94 S.Ct. 3184, 41 L.Ed.2d 1146 (1974). Under these circumstances, we cannot say that the prosecutor's remarks in this case were unduly prejudicial.

Peco and Hoffman next assert that the references to the death threats against Lopez and his family were inflammatory. However, here too the defense's closing remarks invited the prosecutor's line of response. The defense argued that there was no valid reason for the grant of immunity to Hardin and that Agent Lopez had acted out of self-interest in making such generous representations to him. Counsel went on at length about this "conspiracy of agents" and the need to pay off Hardin. Tr.Tr. 696–98. The prosecutor responded by arguing that Lopez struck the deal with Hardin because of the threats against him and his family:

At that time Doug Hardin was exposed. He was moved and basically all hell broke loose then.

Now, what Agent Lopez had was reprisals, the fear of reprisals, the fear of a murder contract of which he learned

from three independent credible sources of $50,000—not only reprisals against himself, but against his wife, his children, his family.

You imagine the devastating effect this would have on a man, to have armed guards or policemen with shotguns at your house.

＊　　＊　　＊　　＊　　＊　　＊

Lopez, out of fear for his wife, for his children, for his parents, unfortunately, and it was a terrible lapse of judgment, did not consult with the attorneys of the United States Government, the Department of Justice, but he did talk to his supervisor of the DEA and he was told to go ahead and do it.

Tr.Tr. 726–27. These comments were directly responsive to the defense's insinuations that the motives of the DEA agents were improper.[10]

■ Finally, Peco and Hoffman object to the fact that the prosecutor characterized them as "merchants in death:"[11]

What this kilo bag 3–B represents, ladies and gentlemen, is the most destructive force in America today. This is the greatest threat to the lives and well-being of our children. Nothing short of nuclear war should scare you more than this. This is death, and people who deal in it are merchants in death.

Tr.Tr. 730. We have held that it is permissible for a prosecutor to "impress upon the jury the seriousness of the charges and a comment on the gravity of the drug problem in this country is certainly not inappropriate." *Zylstra*, 713 F.2d at 1340; *see Kruglak v. Purdy*, 578 F.2d 574, 575 (5th Cir.1978); *Malley v. Manson*, 547 F.2d 25, 28 (2d Cir.1976), *cert. denied*, 430 U.S. 918, 97 S.Ct. 1335, 51 L.Ed.2d 598 (1977).

We reiterate—indeed we stress—that our task is to determine whether the defendants had a fair trial. We do not condone the argument of the prosecutor. However, when read in its totality, we cannot say that the rebuttal constituted reversible error.[12] To a very great extent, it was an attempt—albeit an inept one—to deal with the defense's vigorous assault on the integrity of the government and its witnesses. Indeed, when read in its entire-

---

**10.** Appellants contend that it was improper for the prosecution to impugn the integrity of defense counsel, and to invoke the personal integrity of the prosecutor.

Peco and Hoffman found the following line of argument to be especially prejudicial:

And don't you think for a second that people that ran with Hardin [as did Peco and Hoffman] would have any reluctance to kill a federal agent, his wife, or his children, if they thought they could get away with it because no badge not even a federal badge stops bullets.

Tr.Tr. 729. This argument, they contend, "adroitly but improperly portrayed Mr. Peco, 'as one of the people that ran with Hardin.'" Appellants' Br. 28. We note, however, that no specific objection was made to this statement.

We have stated that, "if the comment were sufficiently prejudicial to warrant reversal, counsel who was present at the time either would have objected forthwith or else would have requested the trial court to give a curative instruction.... The absence of any such request tends to corroborate our appraisal of the probable impact of the remark as minimal." *United States v. Trutenko*, 490 F.2d 678, 680 (7th Cir.1973) *quoted in United States v. Carter*, 720 F.2d 941, 950 n. 7 (7th Cir.1983).

**11.** Appellants' Br. 28.

**12.** The appellants note that they objected in one instance when the prosecutor asserted a personal belief. Tr.Tr. 720. They also objected to the so-called "merchants in death" (Tr.Tr. 730) remark. No objection was made with respect to the remarks about the threats on Agent Lopez. They claim that additional objections would have been futile in light of the court's earlier ruling and would have called additional juror attention to the remarks and the adverse rulings. Appellants' Br. 31.

We can appreciate the reluctance of counsel to intervene during final argument. "[I]nterruptions of arguments, either by an opposing counsel or the presiding judge are matters to be approached cautiously." *United States v. Young*, —— U.S. ——, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985). On the other hand, at the close of the argument, there was no request for a bench conference nor for an appropriate instruction. Tr.Tr. 732. We need not decide whether the trial objections in this case sufficed to preserve all—or any—of the matters argued by counsel in this appeal. Even if we were to assume that all parts of the final argument were the subject of a proper objection, we believe that any error was harmless. *Young*, 105 S.Ct. at 1045 n. 10.

ty, this presentation seems unorganized and unfocused. Its impact on the jury must have been minimal—especially in light of the overwhelming evidence of guilt before the court.

## CONCLUSION

Neither the redirect examination of Agent Lopez nor the final argument of the prosecution deprived the defendants of a constitutional right. They had a fair trial. Their convictions are affirmed.

AFFIRMED.

SWYGERT, Senior Circuit Judge, dissenting.

I agree that the district court did not abuse its discretion in receiving into evidence the redirect examination of Agent Lopez. I do not agree, however, that the impropriety of the prosecutor's closing argument does not require reversal under the invited response doctrine.

Both the Supreme Court and this court have recently had occasion to reexamine the invited response doctrine. In *United States v. Young*, — U.S. —, 105 S.Ct. 1038, 1045, 84 L.Ed.2d 1 (1985), the Supreme Court cautioned that the idea of invited response had perhaps not evolved in the manner contemplated in *Lawn v. United States*, 355 U.S. 339, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958). Prior to *Young*, defense counsel's improper remarks were too often taken by the prosecutor as a license to make otherwise improper comments. 105 S.Ct. at 1045. *Young* makes it clear that this practice represents a misunderstanding of the invited response doctrine. Properly understood, the invited response doctrine means only that a reviewing court must weigh the impact on the jury of the prosecutor's remarks against the impact on the jury of defense counsel's comments. Under *Young* the prosecutor's misconduct is "invited" only if it "did no more than respond substantially in order to right the scale." *Id.* In effect, the misconduct of defense counsel and the prosecutor may cancel each other out. If, however, the prosecutor does more than merely "right

the scale" and makes arguments that impact on the jury to a greater extent than defense counsel's comments a reviewing court must determine if the "uninvited" comments, viewed in the context of the trial as a whole, prejudiced the fairness of the trial. *Id.* at 1047. Comments that exceed the scope of the invited response doctrine are error and will warrant a reversal if not harmless beyond a reasonable doubt.

In *United States v. Mazzone*, 782 F.2d 757 (7th Cir.1986) this court adopted the approach outlined in *Young:*

> The federal government's lawyers may not fight fire with fire. If defense counsel exceed proper bounds in their closing arguments, the prosecutor can object; he can, if need be, ask that counsel be held in contempt for improper argument or questions ... but he cannot respond in kind and violate ethical standards himself.

> .        .        .        .        .

> Properly understood [the invited response] doctrine does not condone the prosecutor's descending to the level of defense counsel or enact the proposition that two wrongs make a right; it merely recognizes that the impact on the defendant from the prosecutor's misbehavior may be less if the defendant's counsel aroused the jury against the prosecutor. See *United States v. Young*, — U.S. —, 105 S.Ct. 1038, 1044–45, 84 L.Ed.2d 1 (1985). The prosecutor's misconduct may just have offset the defense counsel's misconduct, thus producing no net effect on the jury's deliberations.

> .        .        .        .        .

> Misconduct by the prosecutor that is promptly and vigorously corrected by the judge is not reversible error; misconduct that poisons the trial is. The difference is simply the likely impact of the misconduct on the jury. If the impact seems to have been nil ("harmless"), that is just another way of saying that the trial was

not poisoned, due process was not denied, reversible error was not committed. *Mazzone,* at 763 (citations omitted).*

I am willing to concede that defense counsel's arguments entitled the prosecutor to make some of the complained of comments under the invited response doctrine. But, on the record before this court and in the context of the trial as a whole, I am unable to say that at least one of the prosecutor's remarks did not "poison" and prejudice the defendants' trial.

> What this kilo bag 3–B represents, ladies and gentlemen, is the most destructive force in America today. This is the greatest threat to the lives and well-being of our children. Nothing short of nuclear war should scare you more than this. This is death, and people who deal in it are merchants in death.

Trial Transcript at 730.

This remark was completely inappropriate. Whatever defense counsel said it did not warrant this effort to connect the defendants to the spectre of nuclear holocaust. The majority relies on *United States v. Zylstra,* 713 F.2d 1332 (7th Cir. 1983), for the proposition that a prosecutor can impress upon the jury the gravity of the drug problem in this country. In *Zylstra* the prosecutor made a reference to the defendants bringing in marijuana "for distribution to our children and friends." *Id.* at 1340. The comments in *Zylstra* are simply not as egregious or as prejudicial as the attempt to tar the defendants in this case with the brush of nuclear war. The prosecutor's comments, as completely removed as they are from the facts of this case, can only be interpreted as a conscious attempt to inflame the jury.

I cannot say that these defendants received a fair trial in the radioactive glow cast by the prosecutor's comments. I would reverse the convictions of the defendants and remand for a new trial.

---

* In the instant case, the district judge took no corrective action and there is some question as to whether any corrective action was properly asked for. *See ante* at 810, n. 10.