Roland SHEPARD, Petitioner-Appellant,

v.

Michael LANE, Director, Illinois Department of Corrections, and Neil Hartigan, Illinois Attorney General, Respondents-Appellees.

No. 85–2885.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 30, 1986.

Decided May 6, 1987.

Gayle Terry, Federal Defender Program, Chicago, Ill., for petitioner-appellant.

David E. Bindi, Atty. Gen. of Illinois Office, Chicago, Ill., for respondents-appellees.

Before CUDAHY, EASTERBROOK, and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.

In this appeal, we are asked to review the district court's denial of the appellant's petition for a writ of habeas corpus, originally brought pursuant to 28 U.S.C. § 2254. The petitioner has alleged three grounds for habeas corpus relief: 1) ineffective assistance of trial counsel in violation of his sixth amendment right to counsel; 2) denial of his fourteenth amendment due process right to a fair trial because of the prosecutor's misconduct; and 3) denial of due process through the cumulative effect of the ineffective assistance of counsel and prosecutorial misconduct. For the reasons set forth in the following opinion, we affirm the judgment of the district court.

## I

### Background

A. *Facts*

The facts leading to the petitioner's arrest and conviction are not in dispute. The district court skillfully set forth the pertinent facts in its unpublished Memorandum

Opinion and Order. No further elaboration is required:

The State's case leading to Petitioner's conviction was forceful, and hence we recount it in some detail. Joyce Blair was at home at about 1:00 p.m. on June 16, 1981, when a black man she identified in court as Petitioner, wearing a yellow construction hat, white shirt and black pants, knocked on her door and claimed to be a meter reader. Ms. Blair took out a flashlight which the man grabbed from her and used to strike her face. He demanded money, which Blair gave him. He told her he had a gun, pushed her into a bedroom and raped her. The man then broke into a locker from which he took several guns and shells, which he had Blair wrap in a cloth. Then he left the house at approximately 1:30. Blair's father-in-law took her to the hospital and called the police with a description of the assailant who he said was headed toward North Avenue. That evening, Blair selected Petitioner's photograph from among photographs of six people shown to her by the police.

A man named Michael Goy was driving across North Avenue between 1:00 and 1:30 that afternoon. From a distance of about eight feet, he saw a black man he identified in court as Petitioner standing on a corner, wearing a yellow hard hat, white shirt and black pants, and carrying a long parcel with what appeared to be gun butts sticking out of the end. Goy saw the man enter an apartment building gangway, and then exit without the parcel or his hat. Goy himself went into the gangway and found two guns wrapped in a cloth. Goy identified the same cloth that Blair had identified as the one in which she wrapped the guns. Goy gave the guns to a police officer, Sheckells, in the area. Sheckells and Goy then found a yellow hard hat in a garbage can. That hat was identified by Blair and Goy as the hat worn by Petitioner. Goy later made a photographic identification of Petitioner.

Officer John Amoroso heard a radio message that a home invasion and rape suspect was wanted. Amoroso searched the area and began to follow a black man wearing a white shirt, driving a blue Mercury. He followed the man to a gas station. Amoroso and the man got out of their cars. The man, whom Amoroso identified in court as Petitioner, wore black pants and a white shirt, and had gold-capped teeth. Amoroso asked him for his driver's license. The officer then radioed the dispatcher to ask whether the suspect had gold-capped teeth. Ms. Blair was contacted at the hospital, and she told the police that the offender did have gold teeth. Amoroso requested an assist car. Petitioner pushed Amoroso to the ground and pulled the officer's revolver out from his holster. Amoroso and Petitioner lay on the ground struggling over the gun which was, at various moments, approximately three inches from the officer's face, pointed toward his body and toward bystanders. Petitioner tried to pull the trigger and said he was going to kill Amoroso, but Amoroso held the cylinder.

Another police officer, Korhonen, arrived to see Amoroso struggling with Petitioner, Petitioner's finger on the trigger of Amoroso's gun. Korhonen got on top of the two men and wedged his hand in the gun between the pulled hammer and the firing pin to prevent it from firing.

Another police officer, Frugoli, arrived and hit Petitioner over the head with a flashlight, causing Petitioner to release the gun. Petitioner was arrested. Amoroso twice attacked Petitioner and had to be subdued.

At approximately 3:00 p.m., Detective Michael Heridogt advised Petitioner of his *Miranda* rights. Petitioner then told Heridogt that he had gone to a house (at Blair's address) at about noon to meet a woman named Dolores, with whom he had frequently had sexual relations. Dolores told him she was having trouble with her husband and asked him to remove guns from her house. He took several guns and placed them in a gangway and then drove off.

The defense case consisted primarily of Petitioner's testimony. Petitioner raised an alibi defense as to the rape, armed robbery, and home invasion charges, and a different version of the facts as to the attempted murder charge. He testified, in short, that at around 10:00 a.m. on June 16, 1981, he went to his ex-wife's house and remained there visiting with her and their children until around noon. He was wearing black pants and a white shirt. He did not have a hard hat. He drove to a factory where he used to work and remained there until about 1:00. Then, as he was driving, his car overheated and he pulled into a gas station. A policeman pulled up behind him. Both men got out of their cars and the officer approached Petitioner. Petitioner gave the officer his driver's license and then, noticing that his car was beginning to roll, got into the car to stop it. The officer, Amoroso, took out his pistol and hit Petitioner in several spots on the back of his head. Petitioner grabbed Amoroso's arm in self-defense and they wrestled for several minutes. Amoroso had possession of the pistol the entire time. Another officer arrived and Petitioner was hit on the head and knocked unconscious. When he regained consciousness, he was in handcuffs, and Amoroso was kicking and punching him countless times. Petitioner was then taken by squad car to a police station. There, he was dragged out of the car, pushed down steps, kicked and beaten. He was pushed into a wire cage, handcuffed to a wall, and hit again. Officers put him in a van to take him to the hospital, then stopped the ... van in a dark alley and beat Petitioner with a rubber hose blackjack. He was hospitalized for several days. Hospital personnel testified, corroborating the fact that Petitioner was hospitalized.

Petitioner denied having ever been in Blair's home, meeting Blair, having intercourse with her, or attempting to kill Amoroso. Petitioner admitted to a prior guilty plea conviction for bank robbery. On cross-examination, Petitioner admitted to prior convictions for rape and devi-

ate sexual assault, and for escaping from a penitentiary.

Also on cross-examination, Petitioner denied having talked with Detective Heridogt other than giving his name, address, and age, denied having been given his *Miranda* rights, and denied having made a confession to Detective Heridogt.

*United States ex rel. Shepard v. Lane*, No. 85 C 0391, mem. op. at 2–6 (N.D.Ill. Oct. 1, 1985) [hereinafter cited as Mem. op.] [Available on WESTLAW, DCT database].

### B. District Court Opinion

The district court held that it was precluded from granting the writ of habeas corpus because of the overwhelming evidence of petitioner's guilt. The court did find, however, that "it is questionable whether petitioner's counsel provided adequate representation" and that "the prosecution engaged in reprehensible conduct." Mem. op. at 1–2.

Despite the alleged ineffective assistance of counsel, the district court, applying the prejudice component of the two-pronged test of *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), held that there was no reasonable probability that, but for defense counsel's ineffectiveness, the petitioner would have been found not guilty. The court stated that it had "confidence in the jury's outcome." Mem. op. at 7.

With respect to the conduct of the prosecutor, the court stated that it agreed with the Appellate Court of Illinois that the prosecutor's conduct was "reprehensible" and "uncalled for," and that the prosecutor engaged in "ugly tactics." Mem. op. at 9. However, because of the overwhelming evidence against the petitioner, "any constitutional error created by the State's improper conduct was harmless." *Id.* at 10.

### II
### Discussion
### A. Ineffective Assistance of Counsel
#### 1.

■ Mr. Shepard claims that he was denied the effective assistance of counsel be-

cause: 1) counsel failed either to move to suppress statements made by petitioner to police officers after he was allegedly beaten or to investigate the voluntariness of the statements; 2) counsel failed to investigate petitioner's prior criminal record; and 3) counsel made an inadequate pre-trial investigation.

Mr. Shepard argues that he was overwhelmingly prejudiced through the introduction of a pre-trial statement he made to Detective Heridogt regarding his whereabouts at the time of the alleged incident. Detective Heridogt testified that, after petitioner was given his *Miranda* warnings, Mr. Shepard told him that he had gone to the victim's address to meet a woman by the name of Dolores whom he had met on previous occasions. This testimony was introduced in rebuttal to Mr. Shepard's testimony at trial that he had not gone to the victim's address at the time of the alleged incident. Rather, Mr. Shepard stated at trial that he had visited his ex-wife, gone to a factory at which he had previously worked, and taken his car to a gas station because it had overheated. It is undisputed that petitioner's trial counsel failed to move to suppress that statement or to investigate the voluntariness of the statement.

Mr. Shepard further submits that his trial counsel also failed to investigate the petitioner's prior record. On direct examination, defense counsel questioned Mr. Shepard about a prior robbery conviction. The prosecutor then cross-examined him about the prior robbery and, to impeach petitioner's credibility, asked him about prior escape convictions and a prior conviction for rape and deviate sexual assault. Defense counsel was apparently unaware of the prior convictions other than the robbery conviction.

Mr. Shepard also alleges that he was denied the effective assistance of counsel because his trial counsel made an inadequate pre-trial investigation. Defense counsel did not interview any state witnesses and failed to investigate police reports, tapes and other documents subsequently introduced into evidence. According to Mr. Shepard, counsel displayed a profound lack of knowledge concerning petitioner's case. "Review of these reports and records was essential to adequate preparation for effective cross-examination of the police witnesses." Appellant's Br. at 26. Defense counsel failed to object to the introduction of a tape recording that documented the conversations of the police officers with their dispatcher at the time that they were pursuing Mr. Shepard. Defense counsel had not reviewed this tape and did not object to its introduction, even after the trial court twice asked if he objected. Indeed, defense counsel stated: "They [the jury] might find it interesting." Tr.Tr. at 340.

Defense counsel also expressed doubt and misgivings to the jury regarding the petitioner's defense. For example, in his closing argument, trial counsel referred to "the defendant's defense, such as it is." Tr.Tr. at 514.

Mr. Shepard argues that the sum of the alleged delicts by counsel is the equivalent of a failure to fulfill the minimum standards of professional competence required for the effective assistance of counsel.

As the district court correctly noted, a habeas corpus petitioner's claim of ineffective assistance of counsel must be evaluated according to the standards set forth by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. In *Strickland* the Court stated:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id.* at 687, 104 S.Ct. at 2064. The petitioner has the burden of establishing both components of the *Strickland* inquiry. *United States ex rel. Cross v. DeRobertis*, 811

F.2d 1008, 1013 (7th Cir.1987); *see Johnson v. Duckworth*, 793 F.2d 898, 900, 902 n. 3 (7th Cir.), *cert. denied*, — U.S. —, 107 S.Ct. 416, 93 L.Ed.2d 367 (1986); *United States v. Goudy*, 792 F.2d 664, 672 (7th Cir.1986).

In undertaking its analysis of the case, the district court, while expressing grave doubts as to whether the performance of the trial defense counsel met the minimum standards of performance required by the Constitution, chose to address first the "prejudice component" of the *Strickland* methodology. This approach was explicitly sanctioned by the Supreme Court in *Strickland:*

> [A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.

466 U.S. at 697, 104 S.Ct. at 2069; *see also Cross*, 811 F.2d at 1014; *United States ex rel. Smith v. Lane*, 794 F.2d 287, 290 (7th Cir.1986); *United States v. Liefer*, 778 F.2d 1236, 1253 (7th Cir.1985); *Rogers v. Israel*, 746 F.2d 1288, 1292 & n. 3 (7th Cir.1984).

We believe that the district court was quite prudent in deciding upon this course. It permitted a less cumbersome analysis than would have been possible if the court had addressed first the "performance" component. In this case, there was overwhelming evidence of the petitioner's guilt. We agree with the district court's assessment of the evidence:

> The issue as to the rape and robbery charges is identity. Joyce Blair and Michael Goy, each without apparent motive to lie, and with excellent opportunities to observe, described Petitioner as wearing the same clothes, black pants, a white shirt, and a yellow hard hat, and identified him by photograph and in court. Goy saw the person he identified as Petitioner in Blair's neighborhood just after the home invasion, with the guns in the cloth that Blair said Petitioner took from her house. Petitioner was wearing black pants and a white shirt when Officer Amoroso saw him near the area of the crimes. Blair said her assailant had gold-capped teeth, which Petitioner did have.
>
> The attempted murder charge hinged on which version of the facts the jury believed. The officers' accounts corroborated one another. Petitioner has not suggested tactics his counsel might have employed to enhance the credibility of his version of events. We have no reason to believe that Petitioner would have been acquitted of the attempted murder charge if better represented.

Mem. op. at 8.

To show prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068. Here, the alleged errors of counsel are insufficient to undermine confidence in the outcome of the petitioner's trial. There was eye-witness testimony as to the events of which the petitioner was convicted. There is simply no reasonable probability that, if the alleged errors of trial defense counsel had not occurred, the result would have been different.[1]

---

**1.** Petitioner argued before the district court that defense counsel failed to develop petitioner's alibi defense by failing to interview or call as witnesses petitioner's ex-wife or "Phil" from petitioner's former place of employment. Mr. Shepard does not, however, raise that argument before this court and it is therefore waived. *See Yarbrough v. Tower Oldsmobile, Inc.*, 789 F.2d 508, 511–12 n. 5 (7th Cir.1986). Even if the argument were not waived, there is no need to remand the case to the district court for an evidentiary hearing. The Appellate Court of Illinois, on direct appeal of Mr. Shepard's conviction, found that no evidence existed to support the alibi defense. *People v. Shepard*, 114 Ill.App.3d 598, 70 Ill.Dec. 348, 449 N.E.2d 222, 226 (1983) ("As regards failure of defendant's counsel to present witnesses to bolster defend-

## B. *Prosecutorial Misconduct*

The petitioner also claims that habeas corpus relief should be granted because of prosecutorial misconduct. In his closing argument, the prosecutor made several improper references to and comments about the petitioner. The prosecutor called the petitioner at various times a liar, a dog, and an animal. The prosecutor stated that it was "too bad" that the police officers had not broken Mr. Shepard's skull. Tr.Tr. at 560. He said that Officer Korhonen could have killed the petitioner and would have been doing the taxpayers a favor by doing so. *Id.* at 558. The petitioner also argues that the prosecutor made improper attacks on the defense counsel by attacking defense counsel's credibility during closing remarks. Petitioner also argues that the prosecutor improperly vouched for witnesses' testimony based on personal opinion during his closing argument.

■ In evaluating a claim of prosecutorial misconduct as a violation of the petitioner's due process right to a fair trial, the inquiry is whether the prosecutor's closing argument statements " 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " *Darden v. Wainwright,* — U.S. —, 106 S.Ct. 2464, 2472, 91 L.Ed.2d 144 (1986) (quoting *Donnelly v. DeChristoforo,* 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974)). "[I]t 'is not enough that the prosecutors' remarks were undesirable or even universally condemned.' " *Darden,* 106 S.Ct. at 2472 (quoting *Darden v. Wainwright,* 699 F.2d 1031, 1036 (11th Cir.1983)). Rather, the Court in *Darden* evaluated the trial as a whole: 1) whether the prosecutors' statements manipulated or misstated the evidence; 2) whether the statements implicated specific Bill of Rights provisions such as the right to coun-

sel or the right to remain silent; 3) whether the improper statements were an "invited response" to the argument of defense counsel; 4) whether the trial court instructed the jury to disregard the improper statements; 5) whether the defense had and used the opportunity for rebuttal to counter the prosecutors' statements; and 6) the weight of the evidence against the defendant. 106 S.Ct. at 2472–73. This court has taken the same approach. Most recently, we stated that "[t]he test for determining if a prosecutor's closing statement requires reversal of a conviction is whether the remarks were so prejudicial that the defendant was deprived of a fair trial." *United States v. Torres,* 809 F.2d 429, 435 (7th Cir.1987) (citing *United States v. Peco,* 784 F.2d 798, 805 (7th Cir.), *cert. denied,* — U.S. —, 106 S.Ct. 2281, 90 L.Ed.2d 723 (1986); *United States v. Hattaway,* 740 F.2d 1419, 1425 (7th Cir.), *cert. denied,* 469 U.S. 1089, 105 S.Ct. 599, 83 L.Ed.2d 708 (1984); *United States v. Zylstra,* 713 F.2d 1332, 1339 (7th Cir.), *cert. denied,* 464 U.S. 965, 104 S.Ct. 403, 78 L.Ed.2d 344 (1983)); *see also United States ex rel. Shaw v. DeRobertis,* 755 F.2d 1279, 1281 (7th Cir. 1985). The fairness of the trial in its entirety is to be examined to determine whether the prosecutor's statements violated due process. *See United States ex rel. Crist v. Lane,* 745 F.2d 476, 482 (7th Cir. 1984), *cert. denied,* 471 U.S. 1068, 105 S.Ct. 2146, 85 L.Ed.2d 503 (1985). "[T]he well-settled standard of review [is] that we are to consider the prosecutor's conduct not in isolation, but in the context of the trial as a whole, to determine if such conduct was 'so inflammatory and prejudicial to the defendant ... as to deprive him of a fair trial....' " *United States v. Chaimson,* 760 F.2d 798, 809 (7th Cir.1985) (quoting *Zyls-*

ant's alibi, it is painfully obvious that no such evidence existed.") We must presume the correctness of the state court's finding of fact where, as here, the petitioner has not established circumstances that place the correctness of the factual determination in doubt. *See Sumner v. Mata,* 449 U.S. 539, 547, 101 S.Ct. 764, 769, 66 L.Ed.2d 722 (1981); *United States ex rel. Smith v. Lane,* 794 F.2d 287, 289 n. 3 (7th Cir.1986); 28 U.S.C. § 2254(d). Furthermore,

no evidentiary hearing is required when the facts alleged, if proved, would not warrant issuance of the writ of habeas corpus. *See, e.g., Guice v. Fortenberry,* 661 F.2d 496 (5th Cir. 1981). Were Mr. Shepard to establish his alibi—that he had been at his former place of employment until about 1:05 p.m. on the date of the incident—it would not be inconsistent with findings of guilt on the charges of rape, armed robbery and home invasion.

*tra,* 713 F.2d at 1339); *see also Peco,* 784 F.2d at 805.

■ After examining the trial record, including the closing statements and the jury instructions, we have determined that Mr. Shepard's right to a fair trial has not been violated. We do not condone the statements of the prosecutor. We only conclude that, in the context of the trial as a whole, the statements were not " 'so inflammatory and prejudicial to the defendant ... as to deprive him of a fair trial.' " *Zylstra,* 713 F.2d at 1339 (quoting *United States ex rel. Clark v. Fike,* 538 F.2d 750, 760 (7th Cir. 1976), *cert. denied,* 429 U.S. 1064, 97 S.Ct. 791, 50 L.Ed.2d 781 (1977)). The prosecutor's statements, while grossly improper, did not manipulate or misstate the evidence. Neither did the statements implicate any specific rights of Mr. Shepard. Moreover, the trial judge instructed the jury that the closing arguments of the defense counsel and the prosecutor were not to be considered as evidence of the petitioner's guilt. The jurors were also instructed only to consider the evidence that had been introduced at trial. We have already noted that the weight of the evidence against Mr. Shepard was overwhelming. As this court stated in *United States v. Mazzone,* 782 F.2d 757, 764 (7th Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 141, 93 L.Ed.2d 84 (1986): "The evidence against the appellants was overwhelming; it included substantial eyewitness evidence ... as well as physical evidence.... It is almost inconceivable that if the prosecutor had refrained from making the remarks that he did, the appellants would have been acquitted."

Mr. Shepard argues that, in evaluating the prosecutor's misconduct, this court should apply the harmless error standard enunciated by the Supreme Court in *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). However, in *Darden,* the Supreme Court did not use the *Chapman* harmless error standard to evaluate the claim that the prosecution's closing argument rendered the petitioner's trial fundamentally unfair. 106 S.Ct. at 1271–73. The Court explicitly noted that the

prosecution's argument did not "implicate other specific rights of the accused such as the right to counsel or the right to remain silent." *Id.* at 2742. Thus, the burden remained on the petitioner to establish that, but for the prosecutorial misconduct, the outcome of the trial would have been different. We have determined that the appellant did not meet his burden. Mr. Shepard has not been deprived of a fair trial.

## C. *Cumulative Effect*

■ Petitioner finally argues that the reasonableness standard of *Strickland* and the unfairness standard of *DeChristoforo* should not apply. Rather, because of the cumulative effect of both the alleged ineffective assistance of counsel and the prosecutorial misconduct, the court should apply the harmless error standard of *Chapman.* We reject petitioner's argument that we should impose the burden on the government to show, beyond a reasonable doubt, that, but for the prosecutorial misconduct and the ineffective assistance of counsel, the outcome of the trial would have been the same. We note that both of these claims were asserted in *Darden.* Yet, the Supreme Court evaluated each claim separately according to the relevant standard. The ineffective assistance of counsel claim was evaluated according to the *Strickland* standard; the prosecutorial misconduct claim was evaluated according to the *DeChristoforo* standard. The Supreme Court has spoken; we may adopt no other standard.

## Conclusion

The district court carefully analyzed the facts of the case and correctly applied the governing principles of law required by the existing precedent of the Supreme Court of the United States. Accordingly, we affirm its judgment.

AFFIRMED