Larry G. SOLLES, Petitioner–Appellant,

v.

Thomas R. ISRAEL,
Respondent–Appellee.

No. 86–1309.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 22, 1988.
Decided Feb. 8, 1989.

Deborah G. Heilizer, Sidley & Austin, Chicago, Ill., for petitioner-appellant.

Marquerite M. Moeller, Asst. Atty. Gen., Dept. of Justice, Madison, Wis., for respondent-appellee.

Before BAUER, Chief Judge, and WOOD, Jr., and FLAUM, Circuit Judges.

FLAUM, Circuit Judge.

Petitioner Larry G. Solles was convicted by a jury in Wisconsin state court of second-degree murder, armed robbery, and concealing identity while committing the crime of armed robbery in violation of Wis. Stat. §§ 940.02, 943.32(1)(a) and (2), and 946.62. After exhausting his state court remedies, Solles filed a petition for a writ of habeas corpus. The district court denied the petition and Solles appeals.

Solles argues on appeal that: (1) prosecutorial misconduct throughout the trial deprived him of his right to effective assistance of counsel, inordinately lengthened the trial, prejudiced the jury, and rendered the trial fundamentally unfair, in violation of the sixth and fourteenth amendments; (2) the giving of a second-degree murder instruction violated his right to due pro-

cess; (3) the giving of an erroneous instruction deprived him of a fair trial;[1] (4) the unlawful excusal of prospective jurors and the intentional exclusion of self-employed jurors violated his right to a jury trial; and (5) Wisconsin's party to a crime statute, Wis. Stat. § 939.05, is unconstitutional. For the reasons stated herein, we affirm the judgment of the district court.

## I.

Larry G. Solles was originally charged along with codefendants Steven Drenning and Carol Treuthardt with first-degree murder, armed robbery, and concealing identity during the commission of a crime. The charges arose from the death of gas station attendant Frederick Anderson during the early morning hours of March 22, 1976, in Janesville, Wisconsin. Treuthardt was subsequently granted immunity from prosecution in exchange for her testimony. Drenning and Solles were tried jointly.

The facts of this case have been set out in detail by the Wisconsin Court of Appeals, *Drenning v. State of Wisconsin*, Nos. 78–938–CR & 78–939–CR (May 23, 1980), the district court, *Solles v. Israel*, No. 81–C–272 Civ. (Jan. 6, 1983), and in the Magistrate's Recommendation to the district court. The following summary is drawn from those opinions.

The state's theory at trial was that Solles had aided and abetted or conspired with Drenning to rob the gas station and that Drenning had shot and killed Anderson during the course of the robbery. Treuthardt testified that, after a night of drinking at a local bar, she, Drenning, and Solles had driven to the vicinity of the station in Solles' car. She testified that she parked the car about a block away, that Drenning

got out of the vehicle and asked, "Should I shoot him?" and Solles responded, "Only if you have to," and that Drenning pulled a ski mask over his head as he left. Treuthardt also testified that she heard what she thought were two gun shots, after which Drenning returned to the car and said, "Larry, I shot him. I think I killed him. I shot him." She testified that Drenning handed Solles some money and said, "All I could get is $12," to which Solles replied, "Is that all?" Treuthardt further testified that while driving from the scene Drenning kept repeating, "I shot him. Larry, I think I killed him."

The defense theory was that Anderson's death was accidental. Drenning testified that he went to the gas station to sell a gun, because he had heard street talk that Anderson would be interested in buying the gun. He believed that Anderson held himself out as a former mercenary who had been involved in military activities, had acted as an occasional undercover agent for various governmental agencies, and was known to trade in guns.

Drenning testified that he went into the station and offered the gun to Anderson for $75; that Anderson took the gun and examined it and then told Drenning he was "nuts" to ask that price; and that Anderson offered Drenning $20. Drenning testified that when he attempted to retrieve the gun, Anderson shoved him toward the door and the gun fired. Drenning testified that he was shocked and said, "Are you all right?"; that Anderson grabbed him by the jacket with the gun between the two of them; and that Anderson yelled to him, "Get the hell out of here," indicating he did not want the police to come. He testified that as Anderson shoved Drenning toward

---

**1.** On direct appeal, the Wisconsin Court of Appeals held that Solles had waived any error by failing to object to the instruction at trial. After filing this appeal, Solles, through separate counsel, filed a post-conviction motion in state court claiming that the Wisconsin Court of Appeals' refusal to consider the merits of the erroneous instruction claim constituted an independent violation of due process. The state trial court denied the post-conviction motion, and Solles appealed. Because of the pendency of that state court appeal, the State urged this court to ab-

stain from hearing Solles' appeal from the denial of his petition for a writ of habeas corpus. At oral argument, however, the State informed us that the Supreme Court of Wisconsin, in *State v. Schumacher*, 144 Wis.2d 388, 424 N.W.2d 672 (1988), recently ruled that the power to review unobjected to jury instructions extends only to the Supreme Court. Because it is now clear that the Wisconsin Court of Appeals cannot reach the merits of the erroneous instruction, the State has abandoned its abstention argument.

the door, Drenning fell and the gun dropped to the floor, discharging a second time. Drenning stated that he grabbed the gun and ran because he was scared and that he did not know that Anderson was hit by the second shot.

Solles, Drenning, and Treuthardt were stopped by the police within a half hour of the shooting, as they were driving away from Janesville. A gun and ski mask were recovered from Solles' car. Drenning testified that he did not know who owned the ski mask. Solles testified that the ski mask belonged to a friend who frequently used his car.

The evidence at trial showed that less than a full bullet was recovered from Anderson's body, and that there was no exit wound from his body, indicating that he was killed by only a portion or fragment of a bullet which had ricocheted. The evidence also showed that the gun that was recovered from Solles' car was defective and could be discharged without pulling the trigger if the hammer was in the forward position and was struck by a hard object, and that the cylinder, if accidentally rubbed against something, would rotate counterclockwise and thus allow a second bullet to move into firing position.

Additional facts will be discussed in the course of this opinion.

## II.

On appeal, Solles first argues that the prosecutor's misconduct at trial: (1) deprived Solles of his sixth amendment right to effective assistance of counsel; (2) inordinately lengthened the trial and prejudiced the jury in violation of his sixth amendment right to a jury trial; and (3) rendered the trial fundamentally unfair in violation of the fourteenth amendment right to due process.

Every court that has reviewed this case has criticized the prosecutor's conduct of the trial. Even before the trial began, the prosecutor's office leaked reports and issued press releases which caused the trial court to issue a gag order. The State Bar Grievance Committee found that the prosecutor's pre-trial conduct violated four disciplinary rules or canons of ethics. The defendants eventually were forced to move for a change of venue, which was granted, and the trial took place in Waukesha, a city located 75 miles from Janesville. On appeal, the state characterized the trial itself as a "comedy of errors." At oral argument and in its brief on appeal, the state admitted to prosecutorial "bungling and poor trial preparation," and acknowledged that the prosecutor disobeyed a pre-trial discovery order, unnecessarily prolonged the trial by "overtrying" the case, failed to disclose evidence in a timely fashion, lost certain items of evidence and failed to preserve other pieces of evidence, and repeatedly made improper remarks in front of the jury including commenting on excluded evidence and referring to witnesses by their first names. The prosecutor's conduct was thoroughly reviewed in the three prior opinions in this case, cited above in Part I, and we will not here again detail the litany of errors and improprieties committed.

The crucial issue in this case is what effect, if any, did the prosecutor's actions have on the outcome of the trial. For we recognize that on habeas review we do not exercise the supervisory powers that we may employ on direct appeal from trials in the federal district courts and, thus, our appellate scrutiny is somewhat constrained. Nevertheless, as will be apparent from the discussions herein, we remain distressed that the prosecutorial conduct in this case found a level of tolerance and an absence of any substantial judicial sanction in prior proceedings. Despite these concerns, however, our only role on habeas review is to protect against error of constitutional dimension. With that in mind, we turn to the alleged constitutional violations.

### A.

### Effectiveness of Counsel

Initially, we must discuss the standard to be applied in evaluating Solles' claim of ineffective assistance of counsel. In *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court held that, in order to pre-

vail on an ineffectiveness claim, the defendant bears the burden of showing that: (1) counsel's performance was deficient; and (2) the deficient performance prejudiced the defense. Solles argues that a claim of ineffectiveness based on prosecutorial misconduct should be exempt from the *Strickland* standard, and further argues, relying on *Donnelly v. DeChristoforo,* 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974), that we should apply a harmless error standard.

As to Solles' first argument, the *Strickland* Court did, indeed, identify certain situations where the defendant need not make a showing of prejudice. For example, the Court noted that "prejudice is presumed when counsel is burdened by an actual conflict of interest." 466 U.S. at 692, 104 S.Ct. at 2067 (citing *Cuyler v. Sullivan,* 446 U.S. 335, 345–50, 100 S.Ct. 1708, 1716–19, 64 L.Ed.2d 333 (1980)). Similarly, the Court noted that "various kinds of state interference with counsel's assistance" are "legally presumed to result in prejudice." *Id.* In this regard, the Court referred to cases where counsel was prevented from consulting with the accused for a significant period of time or prevented from making independent decisions about how to conduct the defense. *See e.g., Geders v. United States,* 425 U.S. 80, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976) (counsel barred from consulting with client during overnight recess); *Herring v. New York,* 422 U.S. 853, 95 S.Ct. 2550, 45 L.Ed.2d 593 (1975) (bar on summation at bench trial). The Court stated:

> Prejudice in these circumstances is so likely that case-by-case inquiry into prejudice is not worth the cost. ... Moreover, such circumstances involve impairments of the Sixth Amendment right that are easy to identify and, for that reason and because the prosecution is directly responsible, easy for the government to prevent.

466 U.S. at 692, 104 S.Ct. at 2067.

■ However, we find no indication in *Strickland* that claims of ineffectiveness based on prosecutorial misconduct should be exempt from the deficient performance/prejudice standard. Unlike an outright denial of counsel, an impairment of the right to counsel due to prosecutorial misconduct is *not* "easy to identify." *See id.* On the contrary, given the wide variety of potential prosecutorial improprieties, it is very difficult to determine at what point prosecutorial misconduct has so interfered with defense counsel's performance as to cause that performance to be constitutionally ineffective.

Solles' second argument, in reliance on *Donnelly,* is that a harmless error standard should apply. *Donnelly* involved a claim of due process violation based on prosecutorial misconduct. Solles relies on the following dicta in *Donnelly:*

> This is not a case in which the State has denied a defendant the benefit of a specific provision of the Bill of Rights, such as the right to counsel, *Argersinger v. Hamlin,* 407 U.S. 25 [92 S.Ct. 2006, 32 L.Ed.2d 530] (1972), or in which the prosecutor's remarks so prejudiced a specific right, such as the privilege against compulsory self-incrimination, as to amount to a denial of that right.... When specific guarantees of the Bill of Rights are involved, this Court has taken special care to assure that prosecutorial conduct in no way impermissibly infringes them.

*Id.* at 643, 94 S.Ct. at 1871.

■ From this statement, Solles extrapolates that where a specific provision of the Bill of Rights is involved, a harmless error standard is applied. Solles' reliance is misplaced. As a result of *Strickland,* we now know that the Court distinguishes between claims of denial of counsel and claims of ineffective assistance of counsel. *Argersinger* dealt with a denial of counsel claim.[2] Therefore, *Donnelly*'s reference to the right to counsel in *Argersinger* sheds no light on the standard of review for an ineffectiveness claim. That standard of re-

---

**2.** The *Argersinger* Court had reversed a ruling of the Supreme Court of Florida that an indigent's right to court-appointed counsel did not extend to petty offenses punishable by less than six months imprisonment.

view is governed by *Strickland,* a case that post-dates *Donnelly.*

■ Applying the *Strickland* standard, Solles' claim of ineffectiveness fails. All courts to review this case have concluded that defense counsel's performance at trial was outstanding. Upon reading the trial transcript, we too find that defense counsel's tenacity and dedication to protect their clients' rights were impressive. Counsel objected to every error and impropriety of the prosecutor, worked extraordinarily long hours to review late disclosed evidence, and managed to arrange in mid-trial for expert analysis of late disclosed physical evidence. While we are disturbed that defense counsel was forced to overcome so many hurdles, we are confident that Solles received competent assistance in his defense.

### B.

### Length of Trial and Jury Prejudice

■ In asserting that the prosecutor's misconduct inordinately lengthened the trial and adversely prejudiced the jury, Solles relies primarily on a New York Court of Appeals case, *People v. Steinhardt,* 9 N.Y. 2d 267, 213 N.Y.S.2d 434, 173 N.E.2d 871 (1961). In *Steinhardt,* the court reversed a conviction for receiving and concealing stolen property in part because the prosecutor unnecessarily prolonged the trial. In that case, the trial consumed 53 days and was described by the court of appeals as having a "circus atmosphere." *Id.* 213 N.Y.S.2d at 436, 173 N.E.2d 871, at 873. For example, the prosecutor and defense counsel bickered in front of the jury using harsh language and slurring remarks; at one point the prosecutor consumed 20 pages of transcript describing his military honors to the jury; and at another point, after the prosecutor had slung accusations at defense counsel, the court, rather than admonishing the prosecutor, rebuked defense counsel for having "invited" the abusive remarks. *Id.*

In contrast to *Steinhardt,* the proceedings before the jury in the instant case were orderly, and most of the conflicts among counsel occurred outside the presence of the jury. Although the trial, which lasted 26 days, might well have been shorter, we find that the length of the trial, by itself, did not violate Solles' sixth amendment rights. Solles points out, however, that the jury was sequestered for those 26 days, and further argues that because the jury was sent out of the courtroom so often (154 times), and for so long (36% of the trial), and most of the time because of defense objections, the jury became prejudiced against the defendants. He argues that two instances in particular evidence the jury's prejudice. The first occurred near the beginning of the trial, when it was reported to the judge that the clerk of the court had been overheard telling the jury that all the delays were being caused by defense objections and motions. The second occurred in the latter half of the trial, when a juror stopped the trial in the midst of testimony and asked (out of the hearing of the other jurors) that a tool for opening packages be moved away from defendant Solles' reach.

As to the first instance, the judge, upon hearing the report, immediately instructed the jury that defense counsel has a right and a duty to object and admonished the prosecutor in the jury's presence for phrasing his questions in an objectionable manner. As to the second instance, we believe that Solles reads too much into the juror's odd request. In addition, we find that on more than one occasion, the trial judge admonished the prosecutor in the jury's presence and, at one point, informed the jury that a delay was being caused because the prosecutor had neglected to bring evidence to court that day and had to send someone to Janesville to retrieve it. Further, upon reading the transcript, we believe that at times it was apparent to anyone listening that the prosecutor was needlessly prolonging testimony and asking repetitive questions. Indeed, the judge at more than one point warned the prosecutor that the jury was becoming disgruntled and expressed concern that the state's case might be prejudiced.

In sum, on this record we cannot find that the jury became prejudiced against the defendants.

## C.

### Due Process

The central question in this case is whether the cumulative effect of the prosecutor's conduct—which included improper questions and remarks and resulted in late disclosed and lost evidence, trial delays, and jury inactivity (at a few points, members of the jury were observed dozing during testimony)—rendered the trial fundamentally unfair in violation of the fourteenth amendment right to due process. The standard for evaluating this claim is whether "but for the prosecutorial misconduct, the outcome of the trial would have been different." *Shepard v. Lane*, 818 F.2d 615, 622 (7th Cir.1987). *See also Darden v. Wainwright*, 477 U.S. 168, 106 S.Ct. 2464, 2472, 91 L.Ed.2d 144 (1986) ("The relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'") (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974).

To make this determination we must review in greater detail the evidence presented to the jury and the effect of the prosecutor's delay in disclosing certain evidence and loss of or failure to preserve other evidence. A hotly disputed issue in the case was whether Anderson had been killed by a ricocheting bullet. A ricochet theory supported Drenning's claim that the shooting was accidental. The prosecutor failed to provide defense counsel with all of the bullet fragments that had been retrieved from Anderson's skull before trial, and during the trial lost two vials containing additional fragments. Moreover, the prosecutor concealed until the first day of trial the fact that the brain of the victim had been preserved, and therefore could have been centrifuged to recover any remaining fragments. The prosecutor's failure to disclose the existence of the brain was particularly egregious, because at a pretrial hearing defense counsel had stated in open court his belief that the brain was buried along with the body. The prosecutor sat silent and allowed defense counsel to be misled. As improper as this conduct was, however, defense counsel not only managed in midtrial, without a continuance, to have the brain centrifuged, but also obtained a midtrial exhumation of the body to determine whether any metal fragments had dispersed into the body. The evidence thus obtained was presented to the jury, and the prosecutor conceded that less than a full bullet was recovered. Thus, the jury was allowed to draw the inference that Anderson had been killed by a bullet fragment which had ricocheted.

Another important issue was whether Drenning had worn the ski mask that was found in Solles' car. The prosecutor failed to disclose until a few days before trial that the state crime lab had analyzed hairs found in the ski mask. Again, in the midst of trial, without a continuance, defense counsel was able to obtain an out-of-state expert to analyze the hair samples and testify at trial. The resulting testimony, that the hair from the ski mask was inconsistent with Drenning's hair, was potentially very helpful to the defense, since the defense expert was outstandingly qualified and completely overshadowed the state's expert who had taken one course in criminology and had nine months of "on the job training" in the state crime lab. In fact, in light of the defense expert's testimony, in closing the prosecutor told the jury to forget about the state's expert (and to instead focus on Carol Treuthardt's testimony).

A third important issue for the defense was whether Drenning reasonably could have been trying to sell the victim a gun. On the first day of trial, the prosecutor dumped a stack of over 200 papers on defense counsel's table which contained, among other things, witness statements. To add insult to injury, the stack was inaccurately indexed. Moreover, because of the great number of evidentiary hearings[3] and arguments on motions for mistrial that occurred each day, counsel and the judge

---

3. Many of the evidentiary hearings were the result of the prosecutor's failure to disclose that witnesses had been shown photographic line-ups. As counsel learned of the line-ups during trial, hearings on motions to suppress were held.

were working in court an average of 10–12 hours a day, including Saturdays, which left little time for defense counsel to assimilate the late disclosed information. Nevertheless, counsel was able to extract from the stack witness statements regarding Anderson's reputed activities as a mercenary who traded in guns, and this testimony was presented to the jury.[4]

A final issue was whether a robbery had been committed. The state had failed to preserve the money that was found in the gas station after the shooting and failed to preserve the contents of Carol Treuthardt's purse. The state's evidence consisted of (1) Treuthardt's testimony that Drenning came back to the car, handed Solles some money, and said, "All I could get is $12," and (2) the owner of the station's testimony that his inventory showed a shortage of approximately $25. Defense counsel argued at trial that these failures to preserve evidence hampered their ability to attack the state's evidence of a robbery. In particular, it was shown at trial that, a few minutes before the shooting, a customer had paid for gas with a uniquely torn twenty dollar bill. Defense counsel argued that they were prevented from showing that the twenty dollar bill was not in Treuthardt's purse. Also, the prosecutor failed to disclose before trial that a credit card receipt had been found in the station. When the prosecutor offered the receipt into evidence,[5] the judge excluded the receipt from evidence rather than grant the defendants' motion for a mistrial or a continuance. The defense argued that exclusion was an inappropriate remedy, because the receipt might have accounted for the purportedly missing $25.

■ We find that the failure to preserve the money from the station and from Treuthardt's purse and the late disclosure and subsequent exclusion of the credit card receipt did not prejudice the defense. First, defense counsel aggressively demonstrated that the station owner's method of inventory was questionable. Second, even if it had been shown that the unique twenty dollar bill was not in Treuthardt's purse, that fact would have proved nothing, for it might just as easily have been with the rest of the cash that was left in the station. Moreover, Treuthardt testified that Drenning only got $12. Finally, as to the credit card receipt, defense counsel did not later attempt to offer the receipt as part of their case, and the transcript does not reveal the dollar amount of the receipt. Rather, as part of their general argument for a mistrial due to late disclosures, defense counsel speculated that the receipt might have been helpful to account for the allegedly missing $25. We believe that if the receipt had, in fact, been in the amount of $25, defense counsel would have so stated on the record and would have offered the receipt in evidence. Moreover, even though defense counsel was able to establish to the jury that the exact amount of money missing from the station was in question, counsel was unable to shake the station owner's testimony and Treuthardt's testimony indicating that a robbery had occurred. Under these facts, we cannot find that defendants were prejudiced by the late disclosure of the credit card receipt or the failure to preserve the cash from the station and the purse.

The four examples outlined above are the most important in terms of evaluating the effect of the prosecutor's conduct. Other examples could be given, but in each instance either defense counsel overcame the obstacle or the information discovered was relatively insignificant. In addition to the evidence discussed above, we also mention that defense counsel persuasively showed the jury that the gun was defective and

---

**4.** On the eighth day of trial, a police report regarding the victim's gun trading activities mysteriously appeared on a chair in the courtroom after the lunch break. The prosecutor denied any knowledge of how the report got there. Defense counsel was able, however, to present the relevant information to the jury.

**5.** We do not know why the state offered the credit card receipt, but we do not read any meaning into the offer, for throughout the trial the prosecutor offered repetitive, cumulative, and meaningless items of evidence. For example, for no apparent reason he offered a pair of sunglasses that had been found on one of the defendants.

could have accidentally discharged a second time. The bottom line is that we are convinced that the jury was eventually presented with all the evidence and was able to reach a reliable verdict. Moreover, the jury deliberated for a full day, requested to see all the exhibits, and requested that certain testimony be re-read to them, thus further indicating that they gave meaningful consideration to all the evidence.

Finally, we note that appellate review is not a quest for error, or for the "smoking gun," so to speak. Nevertheless, because of the extensive allegations of prosecutorial misconduct, which the state did not attempt to deny, we combed the nearly 5,000 pages of trial transcript to insure that Solles was given a fair review. We are very troubled that one cannot read far without finding an irregularity, a late disclosure, an obstinate refusal to refrain from asking leading questions or to abide by a ruling, a reference to excluded evidence, an improper remark, or a lengthy and useless examination of a witness. Despite these numerous instances, however, defense counsel met every difficulty head on and presented the defendants' case to the jury. Ultimately, the defendants were given a fair hearing by the jury, and the jury believed Carol Treuthardt. We do not condone the prosecutor's performance in this case. But we do not believe the outcome was affected.

### III.

■ Solles' remaining arguments on appeal require less discussion. First, Solles asserts that there was insufficient evidence to support an instruction on second-degree murder. In particular, he argues that the "mere pointing of a gun" is insufficient to satisfy the second-degree murder requirement of imminently dangerous conduct evincing a depraved mind. We disagree. Evidence of Drenning's extreme intoxication was presented by the defense. Intoxication can negate the intent required for first-degree murder. Further, as the Wisconsin Court of Appeals stated—in accordance with Drenning's own testimony—

"entering a gas station with a defective loaded gun ... under the influence of alcohol and drugs, engaging in a struggle for the gun, and fleeing, with the gun in hand, after it had fired twice in the direction of the attendant," constitutes imminently dangerous conduct evincing a depraved mind. *Drenning v. State of Wisconsin*, Nos. 78–938–CR & 78–939–CR at 25 (May 23, 1980). The second-degree murder instruction was appropriate.

■ Second, Solles challenges his conviction on the grounds of an erroneous jury instruction which stated that negligent acts could not be attributed to co-conspirators. The Wisconsin Court of Appeals found that Solles had waived the error by failing to object at trial. Thus, Solles must meet the cause and prejudice requirements of *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). Solles' sole argument to show cause is that, while discussing an intoxication instruction, the trial judge stated that he was "hesitant to give something that doesn't come from the Wisconsin Criminal Jury Instructions," and that therefore counsel was entitled to assume that all the rest of the instructions given would correctly state the law. That argument is without merit. Without a showing of cause, we are precluded from addressing the merits of the erroneous instruction claim.

■ Third, Solles claims that the excusal of prospective jurors by the clerk of the court and the judge violated the "fair cross-section of the community" requirement of *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1972). The *Taylor* Court stated that "[r]estricting jury service to only special groups or excluding identifiable segments playing major roles in the community cannot be squared with the constitutional concept of jury trial." 419 U.S. at 530, 95 S.Ct. at 697. The clerk, admittedly in violation of Wisconsin law, excused jurors who were ill or had vacation plans. The judge granted requests to be excused from a psychiatrist, a hospital switchboard operator, a self-employed service station owner, the operating officer of a company, a self-employed sign painter, the director of

sales of a corporation, an employee who claimed that he would not be reimbursed by his employer, a production manager, an executive secretary, and an administrative assistant. These excusals did not violate the "fair cross-section" requirement. There was no systematic exclusion, and the excused jurors did not comprise a special group or identifiable segment of the community.

■ Finally, Solles argues that Wisconsin's party to a crime statute, Wis. Stat. § 939.05, is unconstitutional on its face and as applied because it permits co-conspirators to be held liable for all crimes committed during the course of a conspiracy, regardless of whether the crime was an actual and probable consequence of the intended crime. This argument is without merit. The statute specifically limits such liability to crimes which are the natural and probable consequence of the intended crime:

(1) Whoever is concerned in the commission of a crime is a principal....

(2) A person is concerned in the commission of the crime if he:

(a) Directly commits the crime; or

(b) Intentionally aids and abets the commission of it; or

(c) Is a party to a conspiracy with another to commit it or advises, hires, counsels or otherwise procures another to commit it. Such a party is also concerned in the commission of any other crime which is committed in pursuance of the intended crime *and which under the circumstances is a natural and probable consequence of the intended crime....*

*Id.* (emphasis added). Further, the statute was constitutionally applied, for a shooting or killing committed during the course of an armed robbery is a natural and probable consequence of the intended crime.

## IV.

For the reasons stated in this opinion, the judgment of the district court is AF-FIRMED.